## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No. _____ - Civ

MARLA MARTINS, Individually and as
*Administrator Ad Prosequendum* for the
Estate of Briana Martins, Decedent;
MARCELO COSTA; G.E., a minor, by and
through her grandmother, legal and natural
guardian, and next friend, MARLA
MARTINS; and TATIANA MARTINS,

       Plaintiffs,

vs.

ROYAL CARIBBEAN CRUISES LTD.,

       Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, MARLA MARTINS, Individually and as *Administrator Ad Prosequendum* for

the Estate of Briana Martins, Decedent; MARCELO COSTA; G.E., a minor, by and through her

grandmother, legal and natural guardian, and next friend, MARLA MARTINS; and TATIANA

MARTINS, by and through undersigned counsel, sues the Defendant, ROYAL CARIBBEAN

CRUISES LTD., and in support thereof alleges:

1.      Plaintiff, MARLA MARTINS, is the mother of the Decedent, a citizen of the United

States and a resident of New Jersey.

2.      Plaintiff, MARCELO COSTA, is the step-father of the Decedent, a citizen of the United

States and a resident of New Jersey.

3.      Plaintiff, MARLA MARTINS, is the grandmother and legal and natural guardian of Plaintiff, G.E., a minor, who is the half-sister of the Decedent, a citizen of the United States and a resident of New Jersey.  G.E.'S claims are brought by and through her grandmother, legal and natural guardian, and next friend, Plaintiff, MARLA MARTINS.

4.      Plaintiff, TATIANA MARTINS, is the older sister of the Decedent, a citizen of the United States and a resident of New Jersey.

5.      The Decedent, Briana Martins, was seventeen (17) years old and was a citizen of the United States and a resident of New Jersey on the date of her death.

6.      Defendant is and was at all times material based in Miami, Florida, and at all times material operated, conducted, engaged and/or carried on a business or business venture in Miami, Florida as a common carrier by water for hire, and, furthermore, owned, managed and/or operated the vessel known as the *Explorer of the Seas*.  Defendant, and any and all predecessors or successors in interest, and officers, agents, servants and employees through whom said defendant acted, are collectively referred to herein as "Defendant."

7.      At all times material, Lilibeth P. Andres, R.N., was a nurse employed by the Defendant as an employee or independent contractor and was at all times material acting within the scope and course of her employment or agency with the Defendant.

8.      At all times material, Ariel Del Rosario, R.N., was a nurse employed by the Defendant as an employee or independent contractor and was at all times material acting within the scope and course of her employment or agency with the Defendant.

9.      At all times material, Mae Catulmo, R.N., was a nurse employed by the Defendant as an employee or independent contractor and was at all times material acting within the scope and course of her employment or agency with the Defendant.

10.     At all times material, Dean Hamilton, M.D., was employed by the Defendant as its ship's physician as an employee or independent contractor and was at all times material acting within the scope and course of his employment or agency with the Defendant.

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C.A. §§1332 and 1333(1).

12.     The Decedent was, prior to her death, issued one of Defendant's customary passenger contract of carriage tickets for a cruise aboard the *Explorer of the Seas* as a paying passenger for a cruise vacation. Plaintiffs are no longer in possession of the ticket contract. However, the terms and conditions of the customary passenger ticket contract are available on Defendant's website.

13.     Venue in this district is appropriate inasmuch as Defendant is based here and because Defendant has a forum selection clause in its customary contract of carriage requiring suit be brought here.

14.     Plaintiffs have complied with all conditions precedent to bringing suit, inclusive of providing timely notice in accordance with the Defendant's customary contract of carriage.

15.     Plaintiffs have filed suit timely in accordance with a tolling agreement reached pre-suit between the Plaintiffs and the Defendant.

## FACTS COMMON TO ALL COUNTS

16.     On or about August 22, 2013, Plaintiffs and Decedent, boarded the *Explorer of the Seas* as paying passengers for a family cruise vacation scheduled to return on August 31, 2013.

17.     From the time they boarded the *Explorer of the Seas* until the Decedent's death, Plaintiff, MARLA MARTINS, Plaintiff, MARCELO COSTA, Plaintiff, G.E., Plaintiff, TATIANA MARTINS, and Decedent only consumed food prepared and provide by the Defendant.

Plaintiff, MARLA MARTINS, Plaintiff, MARCELO COSTA, Plaintiff, G.E., Plaintiff, TATIANA MARTINS, and Decedent did not consume food at any of the ports of call preceding Decedent's death.

18.     At all material times, Defendant exercised control over its vessel the *Explorer of the Seas* and its maintenance, including but not limited to all food services aboard the vessel.

19.     Between approximately 3:00 a.m. on August 24, 2013 and 3:00 p.m. on August 26, 2013 Decedent ingested bacteria ridden food prepared by the Defendant while aboard the Defendant's vessel and developed Salmonellosis.

20.     On August 27, 2013, at approximately 10:50 p.m. Decedent reported to shipboard medical facility for complaining of vomiting, abdominal cramps and diarrhea which began at approximately 3:00 a.m. on August 27, 2013.  Plaintiff, MARLA MARTINS, and Decedent also advised the shipboard medical staff that Decedent underwent bariatric surgery on September 12, 2012.

21.     Shipboard medical staff administered Metoclopramide and Dicyclomine and sent Decedent to her room with Metoclopramide and Imodium capsules.

22.     Relying on the advice of the ship's medical personnel, Plaintiff, MARLA MARTINS, and Decedent returned to their cabin.

23.     Plaintiff, MARLA MARTINS, and Decedent returned to the shipboard medical facility via wheelchair just a few hours later at approximately 2:30 a.m. on August 28, 2013. Plaintiff, MARLA MARTINS, and Decedent advised the shipboard medical staff that Decedent continued to suffer from vomiting, abdominal cramps and diarrhea.  Plaintiff, MARLA MARTINS, and Decedent also advised the shipboard medical staff that

Decedent was hyperventilating, had pain in her shoulders and chest and a burning sensation in her abdomen.

24.    Shipboard medical staff performed a CBC test, reviewed the CBC test results and incorrectly determined the results were normal, sent Decedent to her room and advised her to take the previously prescribed Metoclopramide and Imodium capsules.

25.    The shipboard medical staff did not perform any diagnostic testing on the Decedent.

26.    The shipboard medical staff did not administer any intravenous fluids to the Decedent.

27.    The shipboard medical staff did not administer any intravenous antibiotics to the Decedent.

28.    Rather, the shipboard medical staff opined the Decedent was simply having a panic attack, despite Plaintiff, MARLA MARTINS, advising that Decedent had no history of panic attacks.

29.    Relying on the advice of the shipboard medical staff, Plaintiff, MARLA MARTINS, and Decedent returned to their cabin.

30.    At approximately 9:00 a.m. on August 28, 2013, passengers aboard the *Explorer of the Seas* were permitted to disembark in the port in Labadee, Haiti. However, it is likely the *Explorer of the Seas* was docked in Labadee, Haiti hours before 9:00 a.m.  Defendant could have arranged for a medical disembarkation via fast moving vessel or helicopter for medical care and treatment in Labadee, Haiti when Decedent first presented to the ship clinic.  Defendant could have more easily and rapidly arranged for a medical disembarkation via fast moving vessel or helicopter for medical care and treatment in Labadee, Haiti when Decedent next presented to the ship clinic. And Defendant could

have easily arranged for a medical disembarkation via ship personnel wheeling Decedent to an awaiting ambulance when the ship first docked in Labadee, Haiti.

31.     At approximately 9:30 a.m. on August 28, 2013, Plaintiff, MARLA MARTINS, Plaintiff, MARCELO COSTA, and Plaintiff, G.E., returned to their cabin after eating breakfast and heard Decedent in the shower and vomiting.

32.     Plaintiff, MARLA MARTINS, went inside the bathroom to check on Decedent and found her standing in the shower, vomiting.

33.     Decedent then fell to shower floor and continued vomiting.   Plaintiff, MARLA MARTINS, held the Decedent as she lay on the floor naked, wet and vomiting and with vomitus on her person.  Decedent's eyes began to roll back in her head.

34.     Plaintiff, MARLA MARTINS, called for Plaintiff, MARCELO COSTA, to come into the bathroom and help. Plaintiff, MARCELO COSTA, attempted to lift Decedent's vomited soaked body from the shower as Plaintiff, MARLA MARTINS, called the shipboard medical facility.  G.E. looked on in horror.

35.     Plaintiff, MARCELO COSTA, was able to lift the Decedent to as sitting positioning in the shower as she continued to vomit.

36.     Plaintiff, MARLA MARTINS, and Plaintiff, G.E., attempted to cover Decedent's naked body, much of which was still wet with water and smeared with vomit.

37.     Plaintiff, TATIANA MARTINS, grief stricken, lovingly stroked Decedent's hair.

38.     A shipboard nurse responded to the cabin and confirmed that Decedent was not breathing, had no pulse and there was vomit still in her mouth.  The nurse called for additional medical staff.

39. Additional shipboard medical staff arrived to the cabin and performed resuscitation efforts to no avail, the Decedent was pronounced dead.

40. Plaintiff, MARLA MARTINS, and Plaintiff, TATIANA MARTINS, cleaned the room and collected the Decedent's clothes, including Decedent's underwear which had diarrhea in it.

41. Decedent died as a result of peritonitis due to a small bowel anastomotic site perforation.

42. Defendant held out its staff, including Lilibeth P. Andres, R.N., Ariel Del Rosario, R.N., Mae Catulmo, R.N., and Dean Hamilton, M.D., as being direct employees or its actual agents.

43. Defendant manifested to Plaintiff, MARLA MARTINS, Plaintiff, MARCELO COSTA, Plaintiff, TATIANA MARTINS, and Decedent that its medical staff, including Lilibeth P. Andres, R.N., Ariel Del Rosario, R.N., Mae Catulmo, R.N., and Dean Hamilton, M.D., were acting as its employees and/or actual agents in various ways, including but not limited to the following:

    a. The doctor and nurse both worked at what the Defendant describes in its advertising as its "medical centers";

    b. The "medical centers" are owned and operated by Defendant, which pays to stock the "medical centers" with all supplies, various medicines and equipment; and

    c. The passenger is billed directly by Defendant through the passengers' Sign and Sail Card, whereas the "medical staff", including the doctor and nurse, are paid salaries by Defendant to work in the "medical centers."

44. At all material times, the medical staff in this case, including Lilibeth P. Andres, R.N., Ariel Del Rosario, R.N., Mae Catulmo, R.N., and Dean Hamilton, M.D., were given

uniforms to wear which include name tags, and which have the ROYAL CARIBBEAN CRUISES LTD. name and logo. The uniforms were required by Defendant to be worn by shipboard medical staff.

45.     At all material times, a shipboard doctor is considered to be an Officer on board the vessel and a member of the crew, and was introduced to the passengers as one of the ship's Officers.

46.     At all material times, the shipboard doctors and the nurses were held out to the passengers by Defendant as being members of the ship's crew.

47.     At all material times, the Defendant put the ship's doctors and nurses under the command of the ship's superior officers, including the Master of the ship.

48.     At all material times, the Defendant represents to immigration authorities that their doctors and nurses are members of the ship's crew.

49.     At all material times, the ship's doctors and nurses are permitted to eat with the ship's crew.

50.     At all material times, the Defendant held out its medical staff, including its doctors and nurses, as being its employees who work in the Defendant's "medical centers" on the vessel. Defendant promotes its medical staff and represents them as being their employees through brochures, internet advertising, and on the vessel. Defendant's exemplar ticket contract on its website indicates, in pertinent part, "[t]o the extent Passengers retain the services of medical personnel or independent contractors on or off the Vessel . . .," which suggests that medical personnel are not independent contractors.

51.     At all material times, the Defendant promotes the idea that the medical staff who work in its "medical centers" are employed by the cruise line as part of a marketing tool to induce

passengers such as the Plaintiffs and the Decedent to buy cruises on its ships, particularly because the cruise line goes to various foreign ports which may not have adequate medical care.  Defendant touts their "top notch medical facilities at sea" which meet and exceed all of the minimum recommendations for equipment and qualifications of the medical staff from "gold standard" set forth by the American College of Emergency Physicians.  http://www.royalcaribbeanpresscenter.com/video/256/healthy-guests-happy-vacations-royal-caribbeans-top-notch-medical-facilities-at-sea/

52.   When Decedent was seen by the shipboard doctor and nurses, based on the foregoing, the Plaintiff, MARLA MARTINS, Plaintiff, MARCELO COSTA, Plaintiff, TATIANA MARTINS, and Decedent believed, and were reasonable in their beliefs, that the shipboard doctor and nurses were acting as direct employees or actual agents on behalf of the Defendant.  Plaintiff, MARLA MARTINS, Plaintiff, MARCELO COSTA, Plaintiff, TATIANA MARTINS, and Decedent were never given any reason to believe otherwise.

53.   Plaintiff, MARLA MARTINS, Plaintiff, MARCELO COSTA, Plaintiff, TATIANA MARTINS, and Decedent relied to Decedent's detriment on their beliefs that the shipboard doctor and nurses were direct employees or actual agents of the Defendant in that the Plaintiff, MARLA MARTINS, Plaintiff, MARCELO COSTA, Plaintiff, TATIANA MARTINS, and Decedent followed the advice of the doctors and nurses.

54.   As a result of the Plaintiff, MARLA MARTINS', Plaintiff, MARCELO COSTA'S, Plaintiff, TATIANA MARTINS, and Decedent's reliance upon the shipboard medical staff, the Decedent's peritonitis was not properly diagnosed and treated and the Plaintiffs did not disembark the Decedent themselves immediately upon arrival in Haiti to seek

medical care and treatment. As result, the Decedent died a horrible, yet preventable death.

## COUNT I: WRONGFUL DEATH UNDER DOHSA

55.   Plaintiffs readopt and reallege each and every allegation contained in paragraphs 1 through 54 as though fully set forth herein, and further allege as follows:

56.   Defendant owed a duty to the Plaintiffs and Decedent to exercise ordinary reasonable care under the circumstances for their safety and to provide reasonably safe passage under the circumstances.

57.   Defendant had a duty to the Plaintiffs and Decedent to properly maintain and operate the *Explorer of the Seas*.

58.   Defendant had a duty to the Plaintiffs and Decedent to act reasonably with respect to the health and safety of the Plaintiffs and Decedent under the circumstances.

59.   Defendant had a duty to the Plaintiffs and Decedent to act consistent with, and comply with, all regulations and laws pertaining to the operations of cruise ships.

60.   Defendant had a duty to the Plaintiffs and Decedent to maintain the *Explorer of the Seas* under the circumstances in a manner that did not threaten Plaintiffs' and Decedent's health and safety.

61.   Defendant by and through the acts of its employees or agents, was negligent, and breached the duties owed to Plaintiffs and Decedent in one or more of the following ways:

    a.   Allowing food contamination aboard the vessel;

    b.   Allowing unhealthy and unsafe food to be served aboard the vessel;

    c.  Maintaining the ship so as to allow unhealthy and unsafe food conditions existed aboard the vessel;

    d.  Failing to warn Plaintiffs and Decedent and other passengers that food it was serving was contaminated or had a high probability of contamination and that passengers may become sick or ill from food served aboard its vessel; and

    e.  Notwithstanding that Defendant was aware of the unhealthy and unsafe condition it continued its operation without warning the Plaintiffs and Decedent.

62.  As a direct, proximate and foreseeable result of Defendant's breach, the Decedent suffered severe food poisoning - Salmonellosis.

63.  Additionally, Defendant's employees and agents owed a duty to Decedent to provide prompt and appropriate medical care under the circumstances following the severe food poisoning and resulting peritonitis she developed onboard the *Explorer of the Seas*.

64.  Defendant, by and through the acts of its employees or agents, was negligent, in one or more of the following ways:

    a.  Failing to properly assess the condition of Decedent given her habitus and pre-existing conditions;

    b.  Failing to timely diagnose and appropriately treat the Decedent;

    c.  Failing to recognize and treat Decedent's dehydration;

    d.  Failing to recognize and treat Decedent's signs and symptoms of Salmonellosis and peritonitis;

    e.  Failing to order appropriate diagnostic scans to further assess the Decedent's condition;

    f.  Failing to administer intravenous fluids to the Decedent.

     g.   Failing to administer intravenous antibiotics to the Decedent.

     h.   Failing to obtain consultations with appropriate specialists;

     i.   Failing to properly monitor the Decedent;

     j.   Failing to evacuate the Decedent from the vessel for further care in a timely manner, when she first presented to the clinic, when she next presented to the clinic, and upon the vessel's arrival to Labadee, Haiti;

     k.   Failing to exercise the degree of care and skill of the average qualified practitioner of the arts and science of medicine; and

     l.   Deviating from the standard of care for patients in Decedent's circumstances and who demonstrated the signs and symptoms of peritonitis.

65.    As a direct and proximate result of the negligence of the Defendant, by and through the acts of its employees or agents, as described above, the Decedent died as a result of untreated peritonitis.

66.    Had Decedent received the appropriate care and treatment, it is more likely than not that she would have survived.

67.    Upon information and belief, because the Decedent ingested bacteria ridden food prepared by the Defendant, and the medical negligence complained of herein occurred, in international waters or on the shores of a foreign state and thus outside the territorial United States, the Death on the High Seas Act ("DOHSA") 46 U.S.C. §§761 et seq. applies to the instant Count I.

68.    DOHSA authorizes wrongful death actions on behalf of Decedent's immediate family and dependent relatives, to wit: Plaintiff, MARLIN MARTINS, Decedent's mother, and Decedent's biological father, Manuel Martins.

69.     As a result of this negligence on the part of the Defendant, by and through the acts of its employees or agents, Decedent passed away, and her survivors have suffered and continue to suffer damages.

70.     WHEREFORE, the Plaintiff demands judgment against the Defendant for damages suffered as a result of the demise of Briana Martins, as allowed under DOHSA, including but not limited to the survivors' pecuniary damages, which include loss of support, loss of services of deceased, loss of nurture, guidance, care and instruction, and loss of inheritance, amongst other available remedies. Plaintiff also demands trial by jury for all issues so triable, and any other relief this Honorable Court deems just and proper.

## COUNT II: ALTERNATIVE WRONGFUL DEATH UNDER DOHSA BASED UPON APPARENT AGENCY

71.     Plaintiffs readopt and reallege each and every allegation contained in paragraphs 1 through 54 and 57 through 62, as though fully set forth herein, and further allege as follows:

72.     Alternatively, Defendant's apparent agents owed a duty to Decedent to provide prompt and appropriate medical care under the circumstances following the severe food poisoning and resulting peritonitis she developed onboard the *Explorer of the Seas*.

73.     Alternatively, Defendant, by and through the acts of its apparent agents, was negligent, in one or more of the following ways:

   a.   Failing to properly assess the condition of Decedent given her habitus and pre-existing conditions;

   b.   Failing to timely diagnose and appropriately treat the Decedent;

   c.   Failing to recognize and treat Decedent's dehydration;

d.  Failing to recognize and treat Decedent's signs and symptoms of Salmonellosis and peritonitis;

e.  Failing to order appropriate diagnostic scans to further assess the Decedent's condition;

f.  Failing to administer intravenous fluids to the Decedent.

g.  Failing to administer intravenous antibiotics to the Decedent.

h.  Failing to obtain consultations with appropriate specialists;

i.  Failing to properly monitor the Decedent;

j.  Failing to evacuate the Decedent from the vessel for further care in a timely manner, when she first presented to the clinic, when she next presented to the clinic, and upon the vessel's arrival to Labadee, Haiti;

k.  Failing to exercise the degree of care and skill of the average qualified practitioner of the arts and science of medicine; and

l.  Deviating from the standard of care for patients in Decedent's circumstances and who demonstrated the signs and symptoms of peritonitis.

74.  Alternatively, as a direct and proximate result of the negligence of the Defendant, by and through the acts of its apparent agents, as described above, the Decedent died as a result of untreated peritonitis.

75.  Alternatively, had Decedent received the appropriate care and treatment from Defendant's apparent agents, it is more likely than not that she would have survived.

76.  Upon information and belief, because the Decedent ingested bacteria ridden food prepared by the Defendant, and the medical negligence complained of herein occurred, in international waters or on the shores of a foreign state and thus outside the territorial

United States, the Death on the High Seas Act ("DOHSA") 46 U.S.C. §§761 et seq. applies to the instant Count II.

77.    DOHSA authorizes wrongful death actions on behalf of Decedent's immediate family and dependent relatives, to wit: Plaintiff, MARLIN MARTINS, Decedent's mother, and Decedent's biological father, Manuel Martins.

78.    Alternatively, as a result of this negligence on the part of the Defendant, by and through the acts of its apparent agents, Decedent passed away, and her survivors have suffered and continue to suffer damages.

79.    Alternatively, Defendant is liable to the Plaintiff for any and all damages as a result of negligent medical care by the shipboard doctor and/or nurses under the theory of apparent agency.

80.    WHEREFORE, the Plaintiff demands judgment against the Defendant for damages suffered as a result of the demise of Briana Martins, as allowed under DOHSA, including but not limited to the survivors' pecuniary damages, which include loss of support, loss of services of deceased, loss of nurture, guidance, care and instruction, and loss of inheritance, amongst other available remedies. Plaintiff also demands trial by jury for all issues so triable, and any other relief this Honorable Court deems just and proper.

### COUNT III: NEGLIGENT HIRING, RETENTION AND TRAINING

81.    Plaintiffs readopt and reallege each and every allegation contained in paragraphs 1 through 54 as though fully set forth herein, and further allege as follows:

82.    At all times material, it was foreseeable to the Defendant, that passengers like the Decedent would develop peritonitis or other similar illnesses on the cruise which would result in the presentation of similar signs and symptoms.

83.     At all times material, it was foreseeable to the Defendant that such illnesses would occur
        and require proper examination and evaluation, including appropriate triage in the event
        that the illness would require shore side examination, diagnostic testing, evaluation and
        treatment.

84.     At all times material, the Defendant owed a duty to use reasonable care under the
        circumstances in the hiring, retention and/or training of all medical personnel, including
        the ship's doctors and nurses.

85.     Upon information and belief, Defendant's decisions and actions related to the hiring,
        retention and/or training of the shipboard medical staff occurred within its base of
        operations in Miami, Florida.

86.     At all times material, the Defendant had a duty to hire medical personnel who were
        adequately qualified, trained and experienced to work aboard ships and to conduct
        examinations and evaluations of food borne illnesses which would require treatment
        aboard ships or which might require further evaluations and/or treatments by shore side
        facilities and/or shore side physicians.

87.     The shipboard doctor failed to apprehend and implement fundamental basic medical care
        needs, including but not necessarily limited to the following ways:

        a.  Failing to properly assess the condition of Decedent given her habitus and pre-
            existing conditions;

        b.  Failing to timely diagnose and appropriately treat the Decedent;

        c.  Failing to recognize and treat Decedent's dehydration;

        d.  Failing to recognize and treat Decedent's signs and symptoms of Salmonellosis
            and peritonitis;

e.  Failing to order appropriate diagnostic scans to further assess the Decedent's condition;

f.  Failing to administer intravenous fluids to the Decedent.

g.  Failing to administer intravenous antibiotics to the Decedent.

h.  Failing to obtain consultations with appropriate specialists;

i.  Failing to properly monitor the Decedent;

j.  Failing to evacuate the Decedent from the vessel for further care in a timely manner, when she first presented to the clinic, when she next presented to the clinic, and upon the vessel's arrival to Labadee, Haiti; and

k.  Failing to exercise the degree of care and skill of the average qualified practitioner of the arts and science of medicine.

88.  Defendant breached its duty of care with regard to the hiring and/or retention of the ship's doctor and nurses in one or more of the following manner:

a.  Defendant negligently failed to conduct an appropriate investigation into the backgrounds of the shipboard medical staff, including the doctor and nurses, to determine if they were qualified to practice emergency medicine and to handle examinations and evaluations of peritonitis;

b.  Defendant negligently failed to hire shipboard medical staff, including the doctor and nurses, that had appropriate training and/or experience in emergency medicine, including evaluation of peritonitis;

c.   Defendant negligently failed to hire shipboard medical staff, including the doctor and nurses, which were qualified and/or sufficiently trained and experienced in

the use of diagnostic equipment that was aboard the vessel, which could have

been used for diagnostic testing and evaluation of Decedent's illness; and

    d.  Defendant negligently failed to provide appropriate training and procedures to the

shipboard medical staff, including the doctor and nurses, for use of the ship's

equipment for diagnostic testing.

89.    Defendant negligently retained the shipboard medical staff, including the doctor and

nurses, without providing appropriate training and procedures for triage and referral to

shore side facilities or physician.

90.    Defendant's shipboard doctor exhibited failures to apprehend and implement the most

fundamental of basic medical care needs which clearly demonstrates ample evidence that

the shipboard doctor was not qualified to be hired by the Defendant.

91.    Defendant's shipboard doctor exhibited failures to apprehend and implement the most

fundamental of basic medical care needs which clearly demonstrates ample evidence that

the shipboard doctor was not properly trained.

92.    Defendant's decisions and actions related to the hiring, retention and/or training of the

shipboard medical staff which occurred within its base of operations in Miami, Florida.

93.    As a direct and proximate result of the negligence of the Defendant, the Decedent did not

receive competent medical care, as a result of which her condition deteriorated and she

passed away.

94.    WHEREFORE, and inasmuch as a result of Defendant's decisions and actions related to

the hiring, retention and/or training of the shipboard medical staff which occurred within

its base of operations in Miami, Florida, Plaintiff, MARLA MARTINS, Individually and

as Administrator Ad Prosequendum for the Estate of Briana Martins, Decedent, demands

judgment pursuant to general maritime law against the Defendant for damages for the benefit of the Decedent's survivors and Estate all damages, as specified in the Florida Wrongful Death Act, caused by the illness resulting in death.  Plaintiff also demands trial by jury for all issues so triable, and any other relief this Honorable Court deems just and proper.

95.    WHEREFORE, alternatively as Defendant's vessel is flagged in the Bahamas, and the Decedent died while in the vessel was docked in Haiti, Plaintiff, MARLA MARTINS, Individually and as Administrator Ad Prosequendum for the Estate of Briana Martins, Decedent, demands judgment pursuant to general maritime law against the Defendant for damages for the benefit of the Decedent's survivors and Estate all damages, as specified in the Bahamian Fatal Accidents Act and the Survival of Action Act which together permit recovery of damages similar to those available under Florida's Wrongful Death Act caused by the illness resulting in death.  Plaintiff also demands trial by jury for all issues so triable, and any other relief this Honorable Court deems just and proper.

## COUNT IV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS OF MARLA MARTINS

96.    Plaintiffs readopt and reallege each and every allegation contained in paragraphs 1 through 54 as though fully set forth herein, and further allege as follows:

97.    At all times material hereto, due to the negligent conduct of the Defendant, the Plaintiff, MARLA MARTINS, was placed in an immediate risk of physical harm. The immediate risk of physical harm included consuming similar food which caused Decedent's food borne illness.  The immediate risk of physical harm also included the risk of acquiring Salmonellosis by person-to-person contact by providing care for the Decedent during her

episodes of vomiting and excreting diarrhea. Person-to-person transmission is consistent with the epidemiology of, and a known mechanism of transmission of, Salmonellosis.

98.    Plaintiff, MARLA MARTINS, witnessed the horrific death of her daughter and as a result suffered emotional distress.

99.    Plaintiff, MARLA MARTINS, suffered emotional distress that was long-standing and continuous in nature.

100.   Plaintiff, MARLA MARTINS', emotional distress resulted in physical manifestations, such as sickness, nausea, exhaustion, fatigue, headaches, depression, irritability, anxiety, weight gain, post-traumatic stress, lack of sleep, poor sleep, and/or nightmares.

101.   As a direct and proximate result of the negligent infliction of emotional distress by Defendant, the Plaintiff, MARLA MARTINS, was injured about her body and extremities, suffered physical pain and suffering, mental anguish, loss of enjoyment of life, physical disability, impairment, inconvenience in the normal pursuits and pleasures of life, feelings of economic insecurity caused by disability, disfigurement, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of her injuries including psychiatric care, suffered physical handicap, lost wages, income lost in the past, and/or her working ability and earning capacity has been impaired. The injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future.

102.   WHEREFORE, the Plaintiff, MARLA MARTINS, demands judgment for all damages recoverable under the general maritime law against the Defendant, and demands jury trial of all issues so triable.

### COUNT V: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS OF MARCELO COSTA

103.    Plaintiffs readopt and reallege each and every allegation contained in paragraphs 1 through 54 as though fully set forth herein, and further allege as follows:

104.    At all times material hereto, due to the negligent conduct of the Defendant, the Plaintiff, MARCELO COSTA, was placed in an immediate risk of physical harm. The immediate risk of physical harm included consuming similar food which caused Decedent's food borne illness.  The immediate risk of physical harm also included the risk of acquiring Salmonellosis by person-to-person contact by providing care for the Decedent during her episodes of vomiting and excreting diarrhea.  Person-to-person transmission is consistent with the epidemiology of, and a known mechanism of transmission of, Salmonellosis.

105.    Plaintiff, MARCELO COSTA, witnessed the horrific death of his loved one and as a result suffered emotional distress.

106.    Plaintiff, MARCELO COSTA, suffered emotional distress that was long-standing and continuous in nature.

107.    Plaintiff, MARCELO COSTA'S, emotional distress resulted in physical manifestations, such as sickness, nausea, exhaustion, fatigue, headaches, depression, anxiety, post-traumatic stress, lack of sleep, poor sleep and/or nightmares.

108.    As a direct and proximate result of the negligent infliction of emotional distress by Defendant, the Plaintiff, MARCELO COSTA, was injured about his body and extremities, suffered physical pain and suffering, mental anguish, loss of enjoyment of life, physical disability, impairment, inconvenience in the normal pursuits and pleasures of life, feelings of economic insecurity caused by disability, disfigurement, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of his injuries including psychiatric care, suffered physical handicap, lost

wages, income lost in the past, and/or his working ability and earning capacity has been impaired. The injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future.

109. WHEREFORE, the Plaintiff, MARCELO COSTA, demands judgment for all damages recoverable under the general maritime law against the Defendant, and demands jury trial of all issues so triable.

## COUNT VI: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS OF G.E.

110. Plaintiffs readopt and reallege each and every allegation contained in paragraphs 1 through 54 as though fully set forth herein, and further allege as follows:.

111. At all times material hereto, due to the negligent conduct of the Defendant, the Plaintiff, G.E., was placed in an immediate risk of physical harm. The immediate risk of physical harm included consuming similar food which caused Decedent's food borne illness. The immediate risk of physical harm also included the risk of acquiring Salmonellosis by person-to-person contact by providing care for the Decedent during her episodes of vomiting and excreting diarrhea. Person-to-person transmission is consistent with the epidemiology of, and a known mechanism of transmission of, Salmonellosis.

112. Plaintiff, G.E., witnessed the horrific death of her cousin and as a result suffered emotional distress.

113. Plaintiff, G.E., suffered emotional distress that was long-standing and continuous in nature.

114. Plaintiff, G.E.'S, emotional distress resulted in physical manifestations, such as sickness, nausea, exhaustion, fatigue, headaches, poor school performance, depression, anxiety, weight gain, post-traumatic stress, lack of sleep, poor sleep and/or nightmares.

115.   As a direct and proximate result of the negligent infliction of emotional distress by Defendant, the Plaintiff, G.E., was injured about her body and extremities, suffered physical pain and suffering, mental anguish, loss of enjoyment of life, physical disability, impairment, inconvenience in the normal pursuits and pleasures of life, incurred medical expenses in the care and treatment of her injuries on her behalf including psychiatric care, and/or suffered physical handicap. The injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future.

116.   WHEREFORE, the Plaintiff, G.E., a minor, by and through her aunt, natural guardian and next friend, MARLA MARTINS, demands judgment for all damages recoverable under the general maritime law against the Defendant, and demands jury trial of all issues so triable.

## COUNT VII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS OF TATIANA MARTINS

117.   Plaintiffs readopt and reallege each and every allegation contained in paragraphs 1 through 54 as though fully set forth herein, and further allege as follows:.

118.   At all times material hereto, due to the negligent conduct of the Defendant, the Plaintiff, TATIANA MARTINS, was placed in an immediate risk of physical harm. The immediate risk of physical harm included consuming similar food which caused Decedent's food borne illness.  The immediate risk of physical harm also included the risk of acquiring Salmonellosis by person-to-person contact by providing care for the Decedent during her episodes of vomiting and excreting diarrhea.  Person-to-person transmission is consistent with the epidemiology of, and a known mechanism of transmission of, Salmonellosis.

119.   Plaintiff, TATIANA MARTINS, witnessed the horrific death of her cousin and as a result suffered emotional distress.

120.   Plaintiff, TATIANA MARTINS, suffered emotional distress that was long-standing and continuous in nature.

121.   Plaintiff, TATIANA MARTINS, emotional distress resulted in physical manifestations, such as sickness, nausea, exhaustion, fatigue, headaches, depression, anxiety, post-traumatic stress, lack of sleep, poor sleep and/or nightmares.

122.   As a direct and proximate result of the negligent infliction of emotional distress by Defendant, the Plaintiff, TATIANA MARTINS, was injured about her body and extremities, suffered physical pain and suffering, mental anguish, loss of enjoyment of life, physical disability, impairment, inconvenience in the normal pursuits and pleasures of life, incurred medical expenses in the care and treatment of her injuries on her behalf including psychiatric care, and/or suffered physical handicap. The injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future.

123.   WHEREFORE, the Plaintiff, TATIANA MARTINS, demands judgment for all damages recoverable under the general maritime law against the Defendant, and demands jury trial of all issues so triable.

Respectfully submitted,

**BRILL & RINALDI, THE LAW FIRM**
17150 Royal Palm Boulevard, Suite 2
Weston, FL 33326
Telephone:  (954) 876-4344
Facsimile:  (954) 384-6226

*s/ David W. Brill, Esq.*
**David W. Brill, Esq.**

Florida Bar No.:  959560
Primary e-mail:  david@brillrinaldi.com
Secondary e-mail:  yamile@brillrinaldi.com
**Joseph J. Rinaldi, Jr., Esq.**
Florida Bar No.:  581941
Primary e-mail:  joe@brillrinaldi.com
Secondary e-mail:  yamile@brillrinaldi.com