**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO. 15-21124-CIV-GOODMAN
[CONSENT CASE]**

MARLA MARTINS, et al.,

     Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES LTD.,

     Defendant.

_____/

**ORDER ON DEFENDANT'S SUMMARY JUDGMENT MOTION**

This matter arises from the death of Briana Martins ("Briana"), a seventeen-year old resident of New Jersey, aboard the vessel *Explorer of the Seas*, operated by Defendant Royal Caribbean Cruises, Ltd. ("Defendant" or "RCCL"), in August of 2013. [ECF No. 1]. Plaintiffs[1] allege that Briana's death was caused by the ingestion of bacteria-ridden food aboard the *Explorer of the Seas*, that the shipboard medical staff negligently treated Briana's illness, and that, individually, Marla, Costa, G.E. and Tatiana suffered extreme emotional distress because of RCCL's negligence. [ECF No. 1].

---

[1]     Marla Martins (Briana's mother), individually ("Marla") and as *administrator ad prosequendum* ("Administrator") for the Estate of Briana; decedent; Marcelo Costa ("Costa"); G.E., a minor, by and through her grandmother, legal and natural guardian, and next friend, Marla Martins; and Tatiana Martins ("Tatiana") (collectively, "Plaintiffs").

Earlier in this case, the Undersigned ruled on RCCL's motion to dismiss, granting it in small part and denying it in large part. [ECF No. 30]. Specifically, I dismissed Count III (alleging that RCCL's negligent hiring, retention and training of shipboard medical staff caused Briana's death). RCCL now moves for summary judgment on all six remaining counts.

For the reasons outlined below, the Undersigned **grants in large part and denies in small part** RCCL's summary judgment motion. Plaintiff Marla may proceed to trial on Counts I and II, but all other claims for her and the other Plaintiffs are now precluded because summary judgment for RCCL is appropriate on those claims.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      <u>Procedural History</u>

Plaintiffs filed a seven-count complaint alleging: wrongful death under the Death on the High Seas Act ("DOHSA") (Count I); alternative wrongful death under DOHSA based upon apparent agency (Count II); negligent hiring, retention and training (Count III); and negligent infliction of emotional distress ("NIED") for Marla, Costa, G.E. and Tatiana (Counts IV-VII). [ECF No. 1]. As noted, the Undersigned dismissed Count III, leaving six counts.

### B.      <u>Facts</u>

The "facts" are those listed in RCCL's Statement of Undisputed Material Facts [ECF No. 63] (as long as Plaintiffs did not object to them as being disputed) **and** the

additional facts listed in Plaintiffs' Statement of Material Facts in Opposition [ECF No. 68].

RCCL listed 21 purportedly undisputed facts in its summary judgment motion, and Plaintiffs disputed 9 of them. Specifically, Plaintiffs objected to facts listed in RCCL's numbered paragraphs 7-9, 10, 12-15, and 17.  However, some of the purported disputes are simply Plaintiffs making an argument about the facts or adding some gloss to the facts.  To the extent that Plaintiffs' "dispute" about a specific paragraph is not actually a bona fide factual dispute, the Undersigned will treat the numbered paragraph from RCCL's statement as an undisputed fact or will make the statement undisputed, in context.

However, Plaintiffs' opposition to RCCL's summary judgment motion was accompanied by a separate submission challenging some of RCCL's alleged undisputed facts *and* listing **additional** facts which they say are undisputed. Plaintiffs designated these new undisputed facts as numbered paragraphs 22 – 56. [ECF No. 68]. But RCCL did not submit any type of challenge to these new "undisputed" facts, and it did not file a statement of disputed facts in response to Plaintiffs' additional facts.

Based on this procedural scenario, the Undersigned deems undisputed all the additional facts submitted by Plaintiffs in their counter-designation of material facts [ECF No. 68].

As the plain language of Local Rule 56.1 states, "(a): A motion for summary judgment **and the opposition thereto** shall be accompanied by a **statement** of material facts as to which it is contended . . . there does exist a genuine issue to be tried[.]" S.D. Fla. L.R. 56.1(a) (emphasis supplied).   The Local Rule requires that such statement "(1) Not exceed ten (10) pages in length; (2) Be supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court; and (3) Consist of **separately numbered paragraphs**." *Id.* (emphasis supplied).

Specifically, for statements of material facts submitted in *opposition* to a motion for summary judgment, the Local Rule requires "correspond[ence] with the order and **with the paragraph numbering scheme** used by the movant" and requires that "[a]dditional facts which the party opposing summary judgment contends are material shall be **numbered** and placed at the **end of the opposing party's statement** of material facts [.]" *Id.* (emphasis supplied). Failure of a respondent to file a statement of disputed facts, in the format as required above, causes "[a]ll material facts set forth in the movant's statement" to be "deemed admitted unless controverted by the opposing party's **statement**[.]" S.D. Fla. L.R. 56.1(b) (emphasis added).

When a party properly complies with Local Rule 56.1, it is relatively easy for a court to determine whether there is a genuine disputed issue of fact. Basically, all a court needs to do is to look at the opposing statement of material facts on a paragraph-by-paragraph basis and quickly see whether any paragraphs are designated as

4

disputed.  When a party does not comply with the Local Rule, however, then it is exceedingly difficult for a court to discern if there is a factual dispute. A court needs to review the entire opposing memorandum and determine whether any particular sentence or paragraph is, in fact, a rebuttal piece of evidence which might generate a disputed issue of material fact. This can be an arduous process, and, in any event, generates unnecessary work for the court and its staff.

RCCL did not follow this procedural requirement of Local Rule 56.1 for Plaintiffs' statement of additional facts.[2] Its lack of compliance is so clear-cut that the Court has the discretion to deem Plaintiffs' facts admitted and undisputed and use them when evaluating the propriety of granting RCCL's summary judgment motion. RCCL's defective response -- not disputing the new facts which Plaintiffs contend are undisputed -- essentially leaves the Court with a comprehensive set of Plaintiffs-oriented facts. *See generally  Lugo v. Carnival Corp.*, 154 F. Supp. 3d 1341, 1343 (S.D. Fla. 2015) (admitting facts from defendant's undisputed material facts statement after reviewing the record based on plaintiff's violation of Local Rule 56.1 which left the court with "the functional analog of an unopposed motion for summary judgment") (internal citation omitted); *Regions Bank v. 62' Ocean Sport Fish*, No. 13–20966–CIV, 2014

---

[2]      On a less-significant point, Local Rule 5.1(a)(4) requires that the fonts used in all papers filed with the Court "must be no smaller than twelve (12) point." RCCL's statement of material facts appears to be in 11.5 point font.

WL 4055707, at *2 (S.D. Fla. Aug. 14, 2014) (admitting undisputed facts in plaintiff's statement supported by the record based on defendants' violation of Local Rule 56.1).

But RCCL is not the only party who failed to follow the rules applicable to summary judgment motions. Plaintiffs submitted Marla's affidavit [ECF No. 69-5] as an exhibit to its response in opposition to the summary judgment motion -- but did not include the facts outlined there in their own statement of additional undisputed material facts, which was filed separately. But RCCL never objected to this and did not mention the procedural misstep in its reply memorandum.

Based on the procedural dynamic outlined above, here is the undisputed factual scenario which the Undersigned is using to assess RCCL's summary judgment motion:[3]

**Undisputed Facts from RCCL:**

 1. RCCL engages in the business of providing vacation cruises to the public aboard its vessels. [Shore dep. 109:24-110:4].

2. RCCL owns and operates the vessel *Explorer of the Seas*. [ECF No. 1 at p. 2 - ¶ 6].

---

[3]    At times, the Undersigned has shortened the undisputed facts or summarized them to save space. Also, the Undersigned is keeping the same paragraph numbering system as the parties used in their submissions.  If a paragraph is actually and fully disputed, then the Undersigned will omit the specific factual contention and merely designate the paragraph as "disputed."

3. The *Explorer of the Seas* contains an infirmary staffed by medical personnel for the convenience of passengers on the ship. [ECF No. 1 at p. 4 - ¶ 20; Exhibit 4 to Motion for Final Summary Judgment at p. 2 - ¶ 4(b)].

4. The physicians providing medical care to passengers on the *Explorer of the Seas* in August of 2013 were Dr. Dean Hamilton and Dr. Ariel Del Rosario. [Exhibit 1 to Motion for Final Summary Judgment at p. 1; Exhibit 2 to Motion for Final Summary Judgment at p. 1].

5. Dr. Hamilton was working on the *Explorer of the Seas* in August of 2013 pursuant to an Independent Contractor Senior Physician Agreement with RCCL which commenced on July 25, 2013 and lasted until January 21, 2014. [Exhibit 1 to Motion for Final Summary Judgment at p. 1].

6. Dr. Del Rosario was working on the *Explorer of the Seas* in August of 2013 pursuant to an Independent Contractor Physician Agreement with RCCL which commenced on July 25, 2013 and lasted until September 8, 2013. [Exhibit 2 to Motion for Final Summary Judgment at p. 1].

7. Both Dr. Hamilton's Independent Contractor Senior Physician Agreement with RCCL and Dr. Del Rosario's Independent Contractor Physician Agreement with RCCL state in section (1)(d), labeled "**Independent Contractor**," that "[t]he parties agree that the above named physician is independently contracted to provide professional medical services onboard the above named Royal Caribbean ship, and at all times material

7

hereto, the physician shall operate as, and be considered, an independent contractor, and not an employee of Royal Caribbean or any of its ships or subsidiaries." [Exhibit 1 to Motion for Final Summary Judgment at p. 2 - ¶ 1(d); Exhibit 2 to Motion for Final Summary Judgment at p. 1 - ¶ 1(d)].

8. Both Dr. Hamilton's Independent Contractor Senior Physician Agreement with RCCL and Dr. Del Rosario's Independent Contractor Physician Agreement with RCCL state in section (1)(a), labeled "**Ship Physician Ultimate Responsibility Clause**," that "[t]he ship physician understands and agrees that any/all medical and/or patient care decisions onboard the ship will remain the ultimate responsibility of the ship physician." [Exhibit 1 to Motion for Final Summary Judgment at p. 1 - ¶ 1(a); Exhibit 2 to Motion for Final Summary Judgment at p. 1 - ¶ 1(a)].

9. Dr. Hamilton's Independent Contractor Senior Physician Agreement with RCCL also states in section (1)(a) that "[a]ll medical practitioners enjoy full professional independence in exercising their medical judgment in undertaking medical examination procedures." [Exhibit 1 to Motion for Final Summary Judgment at p. 1 - ¶ 1(a)].

10. Disputed.

11. Both Dr. Hamilton's Independent Contractor Senior Physician Agreement with RCCL and Dr. Del Rosario's Independent Contractor Physician Agreement with RCCL state in a section labeled "**Taxes**," that "[i]t is understood that Royal Caribbean is not required to report and withhold income taxes, social insurance taxes or any other

kind of tax from the compensation paid under this contract." [Exhibit 1 to Motion for Final Summary Judgment at p. 3 - ¶ 1(j); Exhibit 2 to Motion for Final Summary Judgment at p. 2 - ¶ 1(m)].

12. In August of 2013, RCCL's role with respect to the medical care rendered by Drs. Hamilton and Del Rosario was limited to establishing the hours of operation upon which the ship's infirmary was to be open and available to ship guests, and providing logistical support for any medical disembarkations/evacuations that were deemed medically warranted by Drs. Hamilton and Del Rosario. [Exhibit 3 to Motion for Final Summary Judgment at p. 2 - ¶ 5].

13. Disputed.

14. Disputed.

15. Disputed.

16. Marla Martins booked a cruise on the *Explorer of the Seas* for her family, which was to depart on August 22, 2013. [D.E. 1 at p. 3 - ¶ 16; Exhibit 4 to Motion for Final Summary Judgment at p. 1].

17. The Ticket Contract which Marla was provided before the cruise stated that "any medical personnel attending to a Passenger on or off the Vessel, if arranged by Carrier, are provided solely for the convenience of the Passenger, work directly for the Passenger, and shall not be deemed to be acting under the control or supervision of the Carrier, as Carrier is not a medical provider." [Exhibit 4 to Motion for Final Summary

Judgment at p. 2 - ¶ 4(b)]. [However, as amplified below in Plaintiffs' now-undisputed set of facts, RCCL's exemplar ticket contract on its website included additional language.].

18. On July 1, 2013, Marla acknowledged receipt of the cruise ticket contract terms and conditions and confirmed electronically, acceptance of the terms of the ticket contract for each of the members of her family. [Exhibit 4 to Motion for Final Summary Judgment at p. 1].

19. Marla, Briana Martins, Marcelo Costa, G.E., and Tatiana Martins boarded the *Explorer of the Seas* on August 22, 2013. [ECF No. 1 at p. 3 - ¶ 16].

20. Briana Martins was taken to the infirmary on the *Explorer of the Seas* at 10:50 p.m. on August 27, 2013 and again at approximately 2:30 a.m. on August 28, 2013. [ECF No. 1 at p. 3 - ¶¶ 20, 23].

21. Briana Martins died on the ship on August 28, 2013. [ECF No. 1 at p. 7 - ¶ 41].

**Undisputed Facts from Plaintiffs**

10, 12. It was the Defendant's role to examine prior medical history aboard the *Explorer of the Seas* and establish the standard of care relating to treatment and diagnosis of stomach disease and potential stomach disease. [ECF No. 57 Hamilton Deposition 83:7-16]. Defendant established a "Medical Manual" as part of its SQM which:

> [R]epresents [Defendant's] expectations for the management of the shipboard medical centers. The Medical SQM provides a mechanism by which consistent and appropriate policies for the operation of shipboard medical centers are applied fleetwide. . . . Royal Caribbean Cruise Lines is

> committed to providing the very best standard of medical care to our
> guests, crew and visitors, accepting that at times our facilities and medical
> capabilities are limited. All medical centers and operating policies and
> procedures shall meet or exceed current ACEP/CLIA Medical Facilities
> Guidelines. . . . Compliance with this policy shall be monitored during the
> internal and external audit visits, and during visits to the ship by Vice
> President/Global Chief Medical Officer, Director of Medical Operations,
> and the Medical Facilities Specialist.

[Exhibit 1 - RCCL's Chapter 1 Medical Center Operating SQM 1.00 Introduction].

Defendant's Medical SQM controls every aspect of the operation of the shipboard

medical centers. Pursuant to Defendant's Medical SQM, Defendant utilizes the

eSeaCare system. eSeaCare proclaims that it enables cruise lines to "manage every

aspect of medical operations while connecting and collaborating with information

across their entire fleet of ships and shoreside operations. This allows for the

establishment of more efficient operations and improved management visibility and

control while mitigating the high risks involved with administering medical

operations." eSeaCare boasts "[a]n expansive set of clinical decision support rules and

templates provide fleet-wide physicians from various cultural and medical

backgrounds with the appropriate guidance and support for clinical decisions while

adhering to the proper medico legal requirements." eSeaCare also proclaims that it

"utilizes a proprietary and innovative satellite synchronization technology that allows

for continuous operation and real-time visibility across the entire fleet, 24 hours a day,

seven days a week and 365 days a year anywhere in the world." Furthermore,

"eSeaCare also allows for appropriate records to be saved and routinely checked for

sensitive medical and operating equipment. This allows the organization to avoid litigation risk and ensure that the appropriate equipment is being checked routinely and punctually." [Exhibit 2 - tritansoft.com/ eseacare-onboard-manage.html]. *See also supra*, ¶¶ 22-55.

13. Despite his affidavits to the contrary, Defendant's Chief Medical Consultant, Dr. Benjamin Shore testified that in his capacity as Chief Medical Consultant he has received calls from shipboard physicians seeking advice whether a patient should be medically disembarked from a ship by helicopter or other means. [ECF No. 61 Shore Deposition 120:18-25]. Further, and again despite his affidavits to the contrary, Dr. Shore testified that the medical reports of Dr. Hamilton and Dr. Del Rosario were reviewed after their submission into the Defendant's computer system matter which the Defendant deemed to be "out of the ordinary." [ECF No. 61 Shore Deposition 146:3-23].

14-15. Nurse Andres was following the training she received from the Defendant when she failed to clear Briana's airway. [Exhibit 3 - Andres Deposition 33:11-16]. Nurse Andres reported to Briana's cabin in response to an emergency call and not in response to any orders of Dr. Hamilton or Dr. Del Rosario. [Exhibit 3 - Andres Deposition 28:23-29:5]. When Nurse Andres failed to clear Briana's airway, she was not in the presence of Dr. Hamilton or Dr. Del Rosario and had not received any orders from Dr. Hamilton or Dr. Del Rosario regarding clearing the airway of Briana. [Exhibit 3 - Andres Deposition 28:23-29:5]. Defendant mandated compliance with Defendant's SQM by Nurse Andres

and Nurse Catulmo, which was a set of governing rules, standards, policies and procedures and protocols for the medical treatment and care provided to passengers. [D.E. 61 Shore Deposition 162:25-163:7 and Exhibit 4 - RCCL's SQM 4.03 for Chief Nurses and 4.04 for Nurses].

17. Defendant's exemplar ticket contract on its website indicates:

4. MEDICAL CARE AND OTHER PERSONAL SERVICES: a. Availability of Medical Care. Due to the nature of travel by sea and the ports visited, the availability of medical care onboard the Vessel and in ports of call may be limited or delayed and medical evacuation may not be possible from the Vessel while at sea or from every location to which the Vessel sails. b. Relationship with Service Providers. To the extent Passengers **retain the services of medical personnel or independent contractors on or off the Vessel**, Passengers do so at their sole risk. Any medical personnel attending to a Passenger on or off the Vessel, if arranged by Carrier, are provided solely for the convenience of the Passenger, work directly for the Passenger, and shall not be deemed to be acting under the control or supervision of the Carrier, as Carrier is not a medical provider. **Likewise, any onboard concessions** (including but not limited to the gift shops, spas, beauty salon, art program, photography, formalwear concessions) are **either operated by or are independent contractors** on board the Vessel, on Transport or elsewhere and are provided solely for the convenience of Passenger. Even though the Carrier shall be entitled to charge a fee and earn a profit for arranging such services, all such persons or entities shall be deemed independent contractors and not acting as agents or representatives of Carrier. Carrier assumes no liability whatsoever for any treatment, failure to treat, diagnosis, misdiagnosis, actual or alleged malpractice, advice, examination or other services provided by such persons or entities. Guest acknowledges that the Vessel's hair dresser, manicurist, art auctioneer, gift shop personnel, spa personnel, wedding planners and other providers of merchandise and personal services are employees of independent contractors and that Carrier is not responsible for their actions.

[ECF No. 53-4].

22. The medical center is part of the operations of the ship [ECF No. 61 Shore Deposition 60:9-10].

23. The medical center is part of the vessel and Royal Caribbean's ownership, control, and dominion just like any other part of the ship like a stateroom or a restaurant or kids club. [ECF No. Shore Deposition 70:12-17].

24. The advertising material does not state the shipboard doctors are independent contractors. [ECF No. 61 Shore Deposition 65:8-12].

25. Dr. Hamilton and Dr. Del Rosario are three-stripe officers and the highest ranking officer aboard any of the Defendant's vessels is a four-stripe officer. [ECF No. 61 Shore Deposition 83:2-13].

26. Dr. Hamilton and Dr. Del Rosario, as three-stripe officers aboard the *Explorer of the Seas,* participated in muster calls like any other crewmember. [ECF No. 61 Shore Deposition 83:18-22].

26. Dr. Hamilton and Dr. Del Rosario, as three-stripe officers aboard the *Explorer of the Seas*, were considered members of the vessel's crew. [ECF No. 61 Shore Deposition 83:23-84:16].

27. Dr. Hamilton and Dr. Del Rosario, as three-stripe officers aboard the E*xplorer of the Seas*, had a level of command over lower ranking officers and the vessel's crew. [ECF No. 61 Shore Deposition 86:3-4].

28. Dr. Hamilton and Dr. Del Rosario, as three-stripe officers aboard the *Explorer of the Seas*, were entitled to decision-making power of over lower ranking officers and the vessel's crew. [ECF No. 61 Shore Deposition 86:4-5].

29. Dr. Hamilton and Dr. Del Rosario were given the rank of three-stripe officers aboard the *Explorer of the Seas* to garnish the respect, cooperation and obedience from their colleagues and their subordinates in order to conduct their job. [ECF No. 61 Shore Deposition 86:4-9].

30. Dr. Hamilton and Dr. Del Rosario were held to the same standards as other officers aboard the *Explorer of the Seas* with respect to behavior and exercising their duties. [ECF No. Shore Deposition 200:14-201:4].

31. Dr. Hamilton and Dr. Del Rosario were identified to passengers such as the Plaintiffs as officers aboard the *Explorer of the Seas* providing professional services. [ECF No. 61 Shore Deposition 179:10-184:2].

32. Defendant represented to United States public health officials and immigration authorities that Dr. Hamilton and Dr. Del Rosario were officers aboard the *Explorer of the Seas*. [ECF No. 61 Shore Deposition 192:2-11].

33. Defendant expressly permitted Dr. Hamilton, Dr. Del Rosario, Nurse Andres and Nurse Catulmo to act on behalf of Royal Caribbean Cruise Lines within the course and scope of the work they perform as doctors and nurses. [ECF No. 61 Shore Deposition 193:21-194:5].

34. Defendant profited from the shipboard medical center by charging fees to passengers for medical services performed by Dr. Hamilton, Dr. Del Rosario, Nurse Andres and Nurse Catulmo. [ECF No. 61 Shore Deposition 129:18-21].

35. Defendant maintains a computer system used by Dr. Hamilton, Dr. Del Rosario, Nurse Andres and Nurse Catulmo. [ECF No. 61 Shore Deposition 136:24-137:25].

36. Defendant paid for the medical center, the equipment used in the medical center and all medications kept in the center. [ECF No. 61 Shore Deposition 129:22-130:3].

37. Defendant's employees cleaned and maintained the medical center as well as all of the medical equipment used in the medical center. [ECF No. 61 Shore Deposition 131:8-133:4].

38. Defendant conducted internal audits of the medical center equipment logs to make sure the medical center equipment was properly cleaned and maintained. [ECF No. 61 Shore Deposition 133:5-13].

39. Defendant conducted internal audits of the medical center on board the *Explorer of the Seas* to make sure the supplies that were being purchased were not abused and were used in accordance with what was being billed. [ECF No. 61 Shore Deposition 135:14-136:8].

40. Defendant controlled the minimum and maximum number of hours of employment of Dr. Hamilton, Dr. Del Rosario, Nurse Andres and Nurse Catulmo aboard the Explorer of the Seas, and the duties were required to be completed within those hours. [ECF No.61 Shore Deposition 172:1-173:4].

41. Dr. Del Rosario, Nurse Andres and Nurse Catulmo would agree among themselves upon a schedule of hours they would each be in the medical center. After they created the schedule, the schedule was submitted for the approval by the Defendant's hotel director. [ECF No. 61 Shore Deposition 174:25-175:6].

42. Dr. Hamilton and Dr. Del Rosario were required to be available 24 hours a day, seven days a week in case of emergency. [ECF No. 61 Shore Deposition 195:24-196:3].

43. Defendant required Dr. Hamilton, Dr. Del Rosario, Nurse Andres and Nurse Catulmo be available to passengers and crew after closing hours. [ECF No. 61 Shore Deposition 131:4-7].

44. Defendant hired and paid Dr. Hamilton, Dr. Del Rosario, Nurse Andres and Nurse Catulmo to provide medical care in the medical center owned by the Defendant. [ECF No. 61 Shore Deposition 130:4-13].

45. Defendant had the power to fire Dr. Hamilton, Dr. Del Rosario, Nurse Andres and Nurse Catulmo. [ECF No. 61 Shore Deposition 149:12-157:4].

17

46. Defendant required its ship's physicians to wear a uniform provided by the Defendant. [ECF No. 61 Shore Deposition 81:13-83:1].

47. The required uniforms of Dr. Hamilton and Dr. Del Rosario are essentially identical to all other officers aboard the *Explorer of the Seas* and did not distinguish them as independent contractors. [ECF No. 61 Shore Deposition 85:9-24].

48. Defendant provided Dr. Hamilton and Dr. Del Rosario with a name identification tag with Defendant's crown and anchor logo to wear on their provided uniforms. [ECF No. 61 Shore Deposition 176:8-177:7].

49. Defendant charges a professional fee for visits to the shipboard medical center, collects that payment for itself through its Fidelio computer system and Dr. Hamilton and Dr. Del Rosario were paid a bi-weekly salary by the Defendant and did not share in any of the profits generated in the shipboard medical center. [ECF No. 61 Shore Deposition 138:10-17].

50. Defendant mandated compliance by Dr. Hamilton, Dr. Del Rosario, Nurse Andres and Nurse Catulmo with Defendant's SQM, which was a set of governing rules, standards, policies and procedures and protocols for the medical treatment and care provided to passengers. [ECF No. 61 Shore Deposition 162:25-163:7].

51. Defendant's SQM mandated compliance by Dr. Hamilton, Dr. Del Rosario, Nurse Andres and Nurse Catulmo with a specific set of governing rules, standards,

policies and procedures and protocols regarding medical evacuations of passengers aboard the *Explorer of the Seas*. [ECF No. 61 Shore Deposition 166:25-167:5].

52. Defendant's SQM prohibited Dr. Hamilton, Dr. Del Rosario, Nurse Andres and Nurse Catulmo from turning away any passenger who needed medical care. [ECF No. 61 Shore Deposition 198:11-20].

53. The decision to disembark a passenger is made by the vessel's captain and the shipboard physician. [ECF No. 61 Shore Deposition 168:21-25].

54. Defendant secured and paid for malpractice insurance on behalf of Dr. Hamilton and Dr. Del Rosario. [ECF Nos. 53-1 and 53-2].

55. Dr. Hamilton, Dr. Del Rosario, Nurse Andres and Nurse Catulmo were all provided extensive crew member training by the Defendant.

56. From the time they boarded the *Explorer of the Seas* until Briana's death, Plaintiffs and Briana only consumed food prepared and provide by Defendant. Plaintiffs and Briana did not consume food at any of the ports of call preceding Decedent's death. [ECF No. 55 Marla Martins Deposition 158:5-17 169:6-15 and 180:11-15; ECF No. 54 Marcelo Costa Deposition 42:17-43:1, 47:17-48:3 and 56:20-57:2; ECF No. 59 Tatiana Martins 58:23-59:25, 66:5-13 and 78:7-9; and 56 G.E. 54:11-24, 55:20-22 and 57:1-12].

## II.   OVERVIEW OF RCCL'S SUMMARY JUDGMENT ARGUMENTS

RCCL's summary judgment motion asserts the following theories:

1.      RCCL is entitled to summary judgment on Count I because it cannot be held vicariously liable for any negligence committed by the ship's doctors and nurses because they were not employees or actual agents of RCCL and Plaintiffs cannot prove that Briana's symptoms and death were caused by Salmonella contracted on the ship.

2.      RCCL is entitled to summary judgment on Count II because the doctors and nurses were not acting as apparent agents.

3.      RCCL is entitled to summary judgment on <u>both</u> Counts I and II because the Death on the High Seas Act ("DOHSA") is inapplicable to Plaintiffs.

4.      RCCL is entitled to summary judgment on Counts IV through VII because Plaintiffs cannot survive the applicable "zone of danger" test used to evaluate a plaintiff who has not sustained a physical impact as a result of defendant's negligence.

## III.   APPLICABLE LEGAL PRINCIPLES AND ANALYSIS

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted). If the movant establishes the absence of a genuine issue, then the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

For issues on which the opposing party will have the burden of proof at trial, the movant can prevail by merely pointing out that there is an absence of evidence to support the non-movant's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "By its very terms, this standard provides that the mere existence of *som*e alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Likewise, a dispute about a material fact is a "genuine" issue only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

An issue of fact is "'genuine' if the record taken as a whole could lead a rational tier of fact to find for the nonmoving party." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the summary judgment motion.

Nevertheless, the non-movant cannot defeat summary judgment by: (a) "rest[ing] upon mere allegations or denials," *Woolsey v. Town of Hillsboro Beach*, 541 F.

App'x 917, 919 (11th Cir. 2013); (b) "simply *saying* the facts are in dispute," *Latele Television, C.A. v. Telemundo Commc'ns Grp., LLC*, No. 12-22539, 2014 WL 7272974, at *7 (S.D. Fla. Dec. 18, 2014); or (c) relying on "evidence that is merely colorable or not significantly probative," *Fields v. Gorman*, No. 09-61466, 2010 WL 3769396, at *3 (S.D. Fla. Sept. 3, 2010). "Rhetoric and attorney argument are no substitute for record evidence." *Latele*, 2014 WL 7272974, at *7.

To the contrary, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported summary judgment motion. *Anderson*, 477 U.S. at 252. Indeed, "Rule 56 mandates the entry of summary judgment, upon motion, against a party who fails to make a showing sufficient to establish an element essential to his case on which he bears the burden of proof at trial." *Schechter v. Ga. State Univ.*, 341 F. App'x 560, 562 (11th Cir. 2009) (citing *Celotex*, 477 U.S. at 322). A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative is not enough to defeat a properly supported summary judgment motion. *Id.; see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (finding that conclusory allegations and conjecture cannot be the basis for denying summary judgment).

### Were the Doctors and Nurses Independent Contractors or "Borrowed Servants"?

RCCL contends that the two doctors were independent contractors and that the two nurses, who were RCCL employees, were actually "borrowed servants" of the two

22

doctors. [ECF No. 53, p. 2]. It focuses on the "Independent Contractor Senior Physician Agreement." [ECF No. 53, p. 5].  To be sure, this agreement does in fact designate the two doctors as independent contractors, but the Undersigned concludes that there are other facts a jury may consider that could suggest otherwise. Typically, the issue of whether a person is an employee or independent contractor is a question of fact for the jury. *Scottsdale Ins. Co. v. Shageer*, No. 10-80418-CIV, 2010 WL 4961166, at *5 (S.D. Fla. Dec. 1, 2010) (citing Florida appellate cases and noting that the extent of control is a critical factor). *See also Carlson v. FedEx Ground Package Sys., Inc.*, 787 F.3d 1313, 1319 (11th Cir. 2015) (noting that courts initially look to the agreement, "unless other provisions of the agreement, **or the parties' actual practice**, demonstrate that this is not a valid indicator of status.") (internal citation removed) (emphasis added).

The Agreement contains other provisions which could support a conclusion that the doctors were actually employees. [ECF No. 53-1]. For example, section 1(h) mandates that shipboard physicians be present in medical facility according to the hours established by Defendant, as well as being "on call" 24/7 for any medical emergencies outside those designated clinic hours. [ECF No. 53-1, p. 3]. Section 1(h) also mandates that either Drs. Hamilton or Del Rosario must be on the vessel at all times. [ECF No. 53-1]. This Section even orders Drs. Hamilton and Del Rosario to request permission of the master before being permitted to go ashore. [ECF No. 53-1, p. 3].

Concerning the actual practice between RCCL and the doctors, there is evidence which a jury could consider to support the conclusion that RCCL was an actual employer (and the two doctors were employees, not independent contractors) and that RCCL exerted control over the two doctors.

This right to control is key in determining whether the Doctors are considered employees or independent contractors. "In cases of medical malpractice, as in other maritime respondeat superior cases, the essential element of the relationship is the principal's control over its agents." *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1236 (11th Cir. 2014). Defendant fails to adequately address this "essential element," which is unsettling considering that it was the defendant in *Franza*. The *Franza* Court held that it is "manifestly just" to hold principals (like Defendant) responsible for the conduct they command from their employees (like Drs. Hamilton and Del Rosario and Nurses Andres and Catulmo). *Id*. at 1234; 1236 (explaining that "control is the fulcrum of respondeat superior").

As outlined in Plaintiffs' now-undisputed statement of additional facts, RCCL dictated which of Defendant's vessels ships Drs. Hamilton and Del Rosario would serve on as the ship's physicians, the hours that Drs. Hamilton and Del Rosario were employed, the uniform that they would wear, and the amount that it charged to passengers for Drs. Hamilton and Del Rosario's medical services.

24

RCCL also managed the medical equipment in the medical center and every aspect of medical operations in their entire fleet of ships and shoreside operations via eSeaCare. After Dr. Del Rosario and Nurses Andres and Catulmo created a schedule of hours they each worked in the medical center, they then submitted it to the Defendant's hotel director for approval. Defendant secured and paid for malpractice insurance on behalf of Drs. Hamilton and Del Rosario.

Further still, Defendant mandated compliance by Drs. Hamilton and Del Rosario with Defendant's SQM, which was a set of governing rules, standards, policies and procedures and protocols for the medical treatment and care provided to passengers and medical evacuations of passengers aboard the *Explorer of the Seas*. Defendant's SQM prohibited Drs. Hamilton and Del Rosario from turning away any passenger who needed medical care. Defendant conducted internal audits of the medical center equipment logs to make sure the medical center equipment was properly cleaned and maintained and to make sure the supplies that were being purchased were not abused and were used in accordance with what was being billed. Significantly, the decision to disembark a passenger is made by the vessel's captain **and** the shipboard physician.

An entity that employs a physician is subject to vicarious liability for that physician-employee's malpractice if the negligent act was committed in the course and scope of the employment. *Franza*, 772 F.3d at 1241 (citing *Eads v. Borman*, 277 P.3d 503, 511-12 (Or. 2012)). The fact that the employer does not control the medical judgment of

the physician does not negate the employer's liability. *Id.* at 1240. The fact that the passenger ticket contract may call the physician an "independent contractor" does not negate the employer's liability since the physician's status depends not on the statements of the parties but upon all the circumstances of their dealings with each other. *Id.* at 1238 (citing *Cantor v. Cochran*, 184 So. 2d 173, 174 (Fla. 1966)).

In addition, the fact that the shipowner is not a primarily medical enterprise does not negate the employer's liability. *Franza*, 772 F.3d at 1244. And the fact that the patient "controls" the doctor-patient relationship by choosing to go to the ship's infirmary does not negate the employer-shipowner's liability. *Id.* at 1242. Moreover, the fact that the shipowners may not be physically close enough to exercise actual control over its onboard medical staff does not negate the employer-shipowner's liability. *Id.* at 1247.

RCCL notes that it did not withhold income taxes, social insurance taxes or any other kind of tax from the compensation of Drs. Hamilton and Del Rosario pursuant to their continuously renewed 6-month contracts. [ECF No. 53 at 8]. However, in Fair Labor Standards Act ("FLSA") cases, courts have held the characterization of someone as an employee or independent contractor for *tax* purposes is not relevant in determining whether one is an independent contractor or an employee covered by the FLSA. *Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1353 (M.D. Fla. 1997); *see also*, *Gordilis v. Ocean Drive Limousines, Inc.*, No. 12-CV-24358-JLK, 2014 WL 2214289, at *3 (S.D. Fla. May 28, 2014). The same is true in the instant case.

A jury could surely conclude that the doctors were, in fact, independent contractors. But that hardly means that RCCL is entitled to summary judgment on that point. A jury could *also* conclude that they were employees. So the Undersigned rejects this RCCL summary judgment argument.

### Were the RCCL Employee Nurses Actually "Borrowed Servants?"

The Undersigned also rejects RCCL's "borrowed servant" theory for summary judgment purposes.  A jury will need to make that determination.

The "borrowed servant" doctrine is based upon common law master-servant principles that may shift respondeat superior liability from one employer to another who has assumed a right of control over a worker. *See Standard Oil Co. v. Anderson*, 212 U.S. 215 (1909); *U.S. Steel Corp. v. Mathews*, 73 So. 2d 239 (Ala. 1954). Thus, a defendant employer may be able to escape liability for the tortious conduct of its "regular" employee under the borrowed servant doctrine, where the employee has become the "borrowed" employee of another, "special" employer who has come to possess a right of control over the employee's work.

Because the touchstone of respondeat superior liability is the employer's right of control, the regular employer's liability may be cut off provided that such employer has **completely** surrendered its right of control over the employee to the special employer so as to suspend entirely the regular employment relationship. *See Standard Oil*, 212 U.S. at 218-19; *Abraham v. United States*, 932 F.2d 900, 902-03 (11th Cir. 1991) (finding that the

doctrine requires another employer to "assume[] complete control of the servant") (internal citation omitted); *In re Dearborn Marine Serv., Inc.*, 499 F.2d 263, 285 (5th Cir. 1974). If the special employer exercises control but the regular employer also reserves a right of control, then the real suit is joint employment, for which both employers are potentially liable under respondeat superior. *Abraham*, 932 F.2d at 902-04.

Thus, the issue regarding the "borrowed servant" defense in this case is not merely whether Nurses Andres and Catulmo became the borrowed servants of Drs. Hamilton and Del Rosario; it is whether any such borrowing implied that RCCL, the nurses' employer, *completely* surrendered to Drs. Hamilton and Del Rosario its right to control Nurses Andres and Catulmo. The evidence of record is not substantial enough to indisputably establish this.

Nurses Andres and Catulmo both unequivocally testified that their employer was Defendant. [Exhibit 2 - Andres Deposition 6:12-24 and Exhibit 3 - Catulmo Deposition 6:21-24]. Defendant mandated compliance with Defendant's SQM 4.03 for Chief Nurses and 4.04 for Nurses by Nurses Andres and Catulmo, which are a set of governing rules, standards, policies and procedures and protocols for the medical treatment and care provided to passengers. Nurse Andres was following the training she received from Defendant when she failed to clear Briana's airway. [Exhibit 2 - Andres Deposition 33:11-16]. Nurse Andres reported to Briana's cabin in response to an emergency call and not in response to any orders of Drs. Hamilton or Del Rosario.

[Exhibit 2 - Andres Deposition 28:23-29:5]. When Nurse Andres failed to clear Briana's airway, she was not in the presence of Drs. Hamilton or Del Rosario and had not received any orders from Drs. Hamilton or Del Rosario regarding the clearing of Briana's airway. [Exhibit 2 - Andres Deposition 28:23-29:5]. Defendant's SQM prohibited Nurses Andres and Catulmo from turning away any passenger who needed medical care.

These factors are not the hallmark of an employer who surrendered complete control of the nurses to the two doctors. Thus, the Court cannot accept RCCL's "borrowed servant" theory for summary judgment purposes.

### Is There Undisputable Evidence that Briana's Death Was Not Caused By Salmonella Food Poisoning on the Ship?

RCCL's motion contends that it cannot be vicariously liable for the negligence of the doctors or the nurses because Plaintiffs have not, and cannot, prove that Briana's symptoms and death were caused by Salmonella food poisoning contracted on the ship. It says Plaintiffs have not presented evidence that any of the food she ate on the ship was contaminated -- a theory which Plaintiffs strongly challenge.

Plaintiffs begin their opposition on this point with a simple, logical argument: if Briana had food-born salmonella at the time of her death, then she had to have contracted it during Defendant's cruise itinerary. [ECF No. 60 Cano Deposition 111:10-12 and 114:23-115:1-6 and Exhibit 4 - Boorstein Deposition 121:15-25-122:12]. Plaintiffs all testified that during the cruise itinerary, Briana ate food provided only by Defendant

on the ship. [ECF No. 55 Marla Martins Deposition 158:5-17, 169:6-15 and 180:11-15; ECF No. 54 Marcelo Costa Deposition 42:17-43:1, 47:17-48:3 and 56:20-57:2; ECF No. 59 Tatiana Martins 58:23-59:25, 66:5-13 and 78:7-9; and ECF No. 56 G.E. 54:11-24, 55:20-22 and 57:1-12]. According to Plaintiffs' theory, if Briana had food-born salmonella at the time of her death, then the bacteria had to come from Defendant's food.

Plaintiffs stress that Briana's mother placed Briana's diarrhea-stained underwear in a plastic bag, sealed the bag and later produced it for expert testing. Plaintiffs point to the expert opinion of Dr. Raul Cano, who they say determined within a reasonable degree of scientific probability that the stains in Briana's underwear contained Salmonella at levels indicating that she likely was infected with Salmonellosis. They also underscore the opinions of Dr. Robert Boorstein, a board-certified pathologist, who opined that the autopsied tissue findings were consistent with an infectious and inflammatory process and further opined that Briana likely had a bacterial infection caused by the Salmonella. Dr. Boorstein also concluded that the Salmonella illness which was causing symptoms in Briana was linked directly to the ingestion of a foodborne pathogen in the 12-72 hours before the onset of her symptoms, the time when she was on the cruise.

To be sure, RCCL has obtained other experts who find fault with the opinions of Plaintiff's two experts and who criticize Dr. Cano and Dr. Boorstein. But this type of battle of the experts is precisely the type of battle which must be reserved for trial (but

not a summary judgment). *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (noting that summary judgment should be denied "if there is any genuine issue of material fact, **including one created solely by the testimony of a party**.") (emphasis added). In *Feliciano*, the Eleventh Circuit affirmed on interlocutory appeal an order denying the police officers' summary judgment motion based on alleged qualified immunity. *Id.* at 1254. The Eleventh Circuit explained that the permissible dichotomy between the plaintiff's testimony and the testimony of others is the contradiction between the permissible interpretations of the facts, as well as a dispute over some factual contentions; such contradiction "presents a classic swearing match, which is the stuff of which jury trials are made." *Id.* at 1253.

## Were the Doctors and Nurses Apparent Agents?

RCCL also argues that the two doctors and two nurses were not apparent agents. To prevail on a claim of vicarious liability based upon apparent agency, a plaintiff must establish that (1) the alleged principal made some sort of representation or manifestation causing a third party to believe that the alleged agent had authority to act for the benefit of the principal; (2) such belief was reasonable; **and** (3) the third party reasonably acted on such belief to his detriment. *See Franza*, 772 F.3d at 1252; *Smolnikar v. Royal Caribbean Cruises Ltd.*, 787 F. Supp. 2d 1308, 1324 (S.D. Fla. 2011). Significantly, apparent authority only applies when it is the principal, rather than the agent, who

represents to third parties that the agency exists. *Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985).

As noted by Plaintiffs in their response, the Eleventh Circuit has upheld the concept of apparent agency with regard to claims by cruise ship passengers against this very Defendant for medical malpractice. In *Franza*, the court ruled that apparent agency is a valid cause of action in maritime medical malpractice cases. In reversing the trial court's dismissal of the plaintiff's maritime medical malpractice case, the *Franza* court held that the facts may justify holding a shipowner vicariously liable when a passenger receives negligent medical care aboard its ship. 772 F.3d at 1235.

Of course, the mere fact that apparent agency *could* be a viable theory in another case hardly means that it *is* an available claim here. So the Undersigned needs to assess the merits of the theory.

RCCL contends that there is no record evidence demonstrating that *it* made any representations or manifestations to any of the Plaintiffs about the ship's doctors and nurses acting as its agents when they rendered care to Briana. And it says there is also no record evidence suggesting that any of the Plaintiffs spoke to any officer, director or manager of RCCL about this issue.

Recognizing that Plaintiffs focus on the RCCL name tags worn by the doctors and nurses as a manifestation that they were acting as RCCL's agents, RCCL cites to *Meterlogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1356 n. 7 (S.D. Fla. 2000), to

support its position that the RCCL logo is insufficient to create a genuine issue of material fact that an apparent agency was created. In *Meterlogic, Inc.*, the court found that a letter written by Jacobs on KCPL letterhead while he was managing CS did not establish that KCPL authorized CS to act as its agent. *Id.* RCCL emphasizes the language in the contract (i.e., the ticket) and says that Plaintiffs' subjective understanding of the health care providers' status or what the use of the logo signifies is also inadequate.

Plaintiffs, however, contend that the ticket does not plainly explain that all medical personnel are independent contractors; it merely says that they "shall not be deemed to be acting under the control or supervision of the Carrier." They also highlight the following objective facts (in addition to Marla's subjective belief): (1) RCCL required passengers to be treated in the ship's medical center where the two doctors and two nurses worked; (2) RCCL required its doctors to wear uniforms bearing the cruise line's insignia and logo; (3) RCCL required its doctors to wear name identification tags on the uniforms bearing the cruise line's logo and the medical staff members' name, title and rank; (4) RCCL billed patient-passengers directly for the onboard medical services provided by the doctors; (5) the two doctors were referred to as the "ship's doctors;" and (6) RCCL identified the two doctors to passengers as officers aboard the ship.

"An agent's authority may be implied or apparent; it need not be conferred in express terms." *Sugarland Real Estate, Inc. v. Beardsley*, 502 So. 2d 44, 45 (Fla. 2d DCA 1987) (internal citations omitted). "The existence of an agency may be shown by any substantial evidence, either direct or circumstantial." *Id.* at 45 (internal quotation omitted). A factfinder is entitled to "infer from the facts and circumstances of the case the existence of an agency even where the alleged principal and agent both deny the existence thereof." *Id.* at 46 (internal citation omitted). If an agent has apparent authority to enter into a contract on a principal's behalf, then the contract is enforceable against the principal. *Warren v. Dep't of Admin.*, 554 So. 2d 568, 571 (Fla. 5th DCA 1989).

Apparent authority does not arise from the subjective understanding of the person dealing with the purported agent, nor from the appearance created by the purported agent himself; instead, it exists only where the principal creates the appearance of an agency relationship. *Spence, Payne, Masington & Grossman, P.A. v. Philip M. Gerson, P.A.*, 483 So. 2d 775, 777 (Fla. 3d DCA 1986). A principal can create the appearance of an agent's authority by "knowingly permit[ting] [an] agent to act in a certain manner as if he were authorized," *Rushing v. Garrett*, 375 So. 2d 903, 906 (Fla. 1st DCA 1979), by failing to correct a known misrepresentation by an agent that he has certain authority, *Owen Inds., Inc. v. Taylor*, 354 So. 2d 1259, 1262 (Fla. 2d DCA 1978), or by silently acting in a way that creates a reasonable appearance of an agent's authority, *Am. Eagle Credit Corp. v. Select Holding, Inc.*, 865 F. Supp. 800, 813 (S.D. Fla. 1994).

34

To hold a principal liable for the acts of its purported agent under the doctrine of apparent authority, "a party must show that, when dealing with the supposed agent, he [or she] has relied on the agent's authority in good faith, in the exercise of reasonable prudence." *Wells Fargo Bus. Credit v. Ben Kozloff, Inc.*, 695 F.2d 940, 945 (5th Cir. 1982) (internal citations omitted). A party may demonstrate such reliance by showing a change of position, which may include any "'payment of money, expenditure of labor, suffering a loss or subjection to legal liability.'" Restatement (Second) of Agency, §§ 8B(1) and (3); *Suter v. Carnival Corp.*, No. 07-20298-CIV-TURNOFF, 2007 WL 4662144, at *7 (S.D. Fla. May 14, 2007) (footnote omitted).

Specific ways in which a cruise line passenger "may demonstrate such reliance [include] showing that [he or she] purchased his or her cruise ticket based on a reasonable belief that the ship's doctor would be acting as an agent of the cruise line" or "that due to the hospital holding a doctor out as an agent, the patient justifiably relied upon the care or skill of the doctor." *Suter,* 2007 WL 4662144 at *8. *See also Franza*, 772 F.3d at 1252–53.

According to Marla, she justifiably relied on the apparent agency because she (a) submitted Briana to treatment by the ship's medical staff; (b) followed the advice of Dr. Hamilton; and (c) relied on Dr. Hamilton's instructions in not seeking any further medical testing or evaluation once they reached the port in Haiti. She testified that if she had suspected that the shipboard physicians were not actually the agents of Defendant

but some independent standalone doctor with no affiliation with the cruise line, Marla would not have booked the cruise in the first place. [ECF No. 55 Marla Martins Deposition at 290:14-24].

Marla likewise testified that if she had suspected that shipboard physicians were not actually the agents of Defendant but some independent standalone doctor with no affiliation with the cruise line, she would have insisted on getting some kind of help beyond the shipboard medical staff. [*Id.* at 290:25-291:6]. Marla contends that she detrimentally relied on the apparent agency between Drs. Hamilton and Del Rosario and Defendant; in relying on and following their advice, Briana's peritonitis was not properly diagnosed and treated, and Briana did not disembark immediately upon arrival in Haiti to seek medical care and treatment. Plaintiffs say this is the same kind of justifiable, detrimental reliance the *Franza* Court found more than sufficient. *Franza,* 772 F.3d at 1252–53.

I appreciate the obvious fact that Marla's testimony is self-serving, but that does not mean it is unavailable to defeat a summary judgment motion. Most testimony provided by parties in lawsuits is self-serving. Likewise, the mere fact that RCCL may have grave doubts about Marla's credibility on the facts related to the apparent agency theory is also insufficient to render it off-limits for summary judgment analysis.

Given the facts emphasized by Plaintiffs and the permissible inferences a jury would be entitled to make, the Undersigned concludes that summary judgment for

RCCL on the alleged inapplicability of the apparent agency theory is inappropriate, and I therefore reject it. *See generally Ja Dan, Inc. v. L-J, Inc.*, 898 F. Supp. 894, 900-01 (S.D. Fla. 1995) (following a bench trial, the district court held that agents had apparent authority to contract with subcontractors for prime contractors).

### Are All Plaintiffs Eligible Parties Under *DOHSA*, and, if so, Have They <u>Established an Adequate Pecuniary Loss?</u>

Section 30302 of DOHSA provides that an action under the statute "shall be for the exclusive benefit of the decedent's spouse, parent, child, or dependent relative." 46 U.S.C. § 30302. Moreover, the amount and apportionment of recovery is limited to "a fair compensation for the pecuniary loss sustained by the individuals for whose benefit the action is brought." 46 U.S.C. § 30302. Non-pecuniary damages, such as pain and suffering, mental anguish, and loss of society, are **not** recoverable under DOHSA. *See Dooley v. Korean Air Lines*, 118 S. Ct. 1890, 1894-95 (1998) (noting that because Congress chose to not authorize a survival action for a decedent's pre-death pain and suffering, there is no general maritime survival action for such damages). Plaintiffs here seek damages for only loss of support, loss of services, loss of nurture, guidance, care and instruction, and loss of inheritance.

Briana's sister Tatiana Martins [ECF No. 1 at ¶ 4], half-sister G.E. [ECF No. 1 at ¶ 3], and step-father Marcelo Costa [ECF No. 1 at ¶ 2] cannot recover under DOHSA because they simply do not fit under any of the specific categories enumerated in Section 30302 and were not dependent on Briana, who was seventeen (17) years old at

the time of her death. [ECF No. 1 at ¶ 5]. The law interpreting DOHSA is clear that non-dependent siblings cannot maintain an action under the statutory scheme. *See Ephraimson-Abt v. Korean Air Lines*, 199 F.3d 1322 (2d Cir. 1999). *See also Evich v. Connelly*, 759 F.2d 1432, 1433 (9th Cir. 1985) ("Siblings must prove their dependency in order to bring a DOHSA action.") (internal citation omitted).

Moreover, a step-parent does not qualify as a "parent" under DOHSA -- and can therefore recover only as a "dependent relative." *See Petition of the United States*, 418 F.2d 264, 271 (1st Cir. 1969). "Dependency" in DOHSA is defined as "the existence of a legal or voluntarily created status where the contributions are made for the purpose and have the result of maintaining or helping to maintain the dependent of [her] customary standard of living." *Id.* at 272. This definition requires that some form of financial dependency exist between decedent and "dependent relative."

In their response to RCCL's summary judgment motion, Plaintiffs concede [ECF No. 69] that Tatiana and Marcelo cannot recover under DOHSA. Therefore, at a minimum, summary judgment in RCCL's favor against Marcelo and Tatiana is warranted on Counts I and II.

But Plaintiffs contend that G.E. and Marla can recover under DOHSA. They say that Briana, at her own expense, would buy G.E. toys and dolls and take her out to eat. They say that she took care of G.E. by bathing her and by helping to clean the house.

And they say that Marla is eligible under DOHSA because of an *expectation* of support, based on prior support. They claim that Briana contributed $50 per week to Marla for household expenses in the year and a half before she died. They also note that Tatiana still lives at home with Marla at age 24 and contributes $500 per month to the family household.[4] According to Plaintiffs, this demonstrates the closeness of the family and supports the notion that Britany had contributed and would have continued to contribute had she not died.

RCCL challenges these representations and arguments, suggesting that they are either exaggerated or downright false. For example, it implicitly brands as illogical the notion that an unemployed high school student like Briana would regularly be contributing $200 to Marla for the family budget. Likewise, it contests the argument that Marla could reasonably expect Briana to have continued to provide any meaningful financial support by noting her less-than-stellar academic and employment record.

For example, RCCL notes that Briana performed poorly in school, receiving a 0.0 GPA in 2010-11 -- when she was administratively removed from her high school after being suspended for approximately forty-one (41) days -- and a 1.886 GPA in 2011-12. [ECF No. 55 Marla Martins Deposition 70:23-71:1, 71:17-71:21, 74:6-74:9]. Moreover, RCCL notes that Briana ultimately withdrew from school in May or June of 2013, when

---

[4]     These purportedly undisputed facts were not listed in Plaintiffs' statement of additional undisputed facts. Instead, they come from Marla Martin's affidavit, attached to Plaintiffs' memorandum in opposition to RCCL's summary judgment motion. [ECF No. 69-5].

she was in the eleventh grade. [*Id.* at 63:1-63:4, 67:2-67:9]. Also, Briana did not have an employment history that would establish a potential to provide future support. Briana never filed an income tax return, and the only job that Briana had in either 2012 or 2013 was a position as an attendant at Chuck E. Cheese for approximately three weeks in July and August 2013. [*Id.* at 83:16-84:12, 85:6-85:15].[5]

But the Undersigned is reluctant for summary judgment purposes to simply classify this testimony as false and conclude that Marla has not established dependency. I recognize that RCCL has cited a case in which summary judgment for the defense was entered in a somewhat analogous situation.[6] The scenario portrayed by Plaintiffs may well be highly atypical and may provide comparatively weak support for Marla's claim of financial dependency, but it cannot simply and safely be discarded by me now as untrue to grant summary judgment for RCCL.

So the Undersigned rejects for summary judgment purposes RCCL's argument that Marla is not eligible under DOHSA.[7] But the same cannot be said for G.E.'s status.

---

[5]     RCCL did not list these facts in its statement of undisputed material facts, but Plaintiffs have not contested their accuracy.

[6]     *Tello v. Royal Caribbean Cruises, Ltd.*, 946 F. Supp. 2d 1340, 1343 (S.D. Fla. 2013).

[7]     The parties have not submitted any documents, such as bank account records, to confirm or undermine the claim that Briana contributed more than $200 per month (i.e., $50 per week) to her mother as an unemployed high school student. A jury is surely free to reach inferences from that.

The record is devoid of evidence to sufficiently demonstrate for summary judgment purposes that G.E. was **financially dependent** on her half-sister Briana, a 17-year-old high school student. The fact that Briana bought G.E. toys and dolls and took her out to eat on occasion is woefully insufficient to establish financial dependency. The court's decision in *Connecticut National Bank v. Hawaiian Independent Refinery, Inc.*, 1989 U.S. Dist. LEXIS 15031 (S.D.N.Y. 1989) is instructive. In *Connecticut National Bank*, a decedent's brothers, sisters, nieces, and nephews filed an action under DOHSA. The court determined that none of decedent's relatives were dependents and that, therefore, no claim could be maintained on behalf of any of them. *See id.* at *10. The court rejected the notion that bestowing a relative with gifts could create a financial dependency.

The only rational interpretation of the record evidence is that, at the time of Briana's death, G.E. was financially dependent on **Marla** Martins, G.E.'s legal guardian and caretaker who was in the process of adopting her [ECF No. 55 Marla Martins Deposition 24:6-24:7, 29:2-29:4, 33:23-33:25], *not* her half-sister Briana. Ms. Martins testified that Briana did not pay for G.E.'s room and board [*Id.* at 33:2-33:4], and, when asked whether Briana provided G.E. with financial support [*Id.* at 32:23-33:6], she did not testify that Briana gave G.E. money or paid for G.E.'s clothing or food on a regular and systematic basis.

Where, as here, one is supported by a parent or guardian and not by a sibling, dependency under DOHSA has not been established for the sibling. *See Oldham v.*

41

*Korean Air Lines Co., Ltd.*, 127 F.3d 43, 51 (D.D.C. 1997) ("We agree with KAL that there is no evidence that Charlotte was financially dependent upon her brother. To the contrary, the record shows that she was supported by her mother and that Mr. Oldham had never provided her with any financial support prior to his death.").

Even assuming *arguendo* that Plaintiffs had sufficiently established for summary judgment purposes that G.E. was financially dependent on Briana (and they have not), summary judgment in favor of RCCL as to G.E.'s claims in Counts I and II is still appropriate because G.E. has failed to prove a pecuniary loss under DOHSA. *See Conn. Nat'l Bank*, 1989 U.S. Dist. LEXIS 15031 at *5 (finding that for determining the availability of recovery of damages in a DOHSA action, "dependency is an independent element which must be established in addition to pecuniary loss") (internal citations omitted).

To recover for pecuniary loss, the value must be proven and reasonably certain. *Tello*, 946 F. Supp. 2d at 1343; *Matter of Adventure Bound Sports, Inc.*, 858 F. Supp. 1192, 1201 (S.D. Ga. 1994) ("To recover for this pecuniary loss, a claimant must present testimony assigning a value to the services performed by the decedent."); *Ivy v. Sec. Barge Lines, Inc.*, 585 F.2d 732, 740 (5th Cir. 1978) ("No documentary evidence was introduced establishing the amount of [the decedent's] financial contributions to the family, nor were his services around the house in any way valued. Under the circumstances, we conclude that the evidence of support and services was insufficient

to show that the Ivys suffered any monetary loss for support and services by their son's death . . . . The trial judge erred in submitting this issue to the jury.").

There is no evidence in the record that G.E. sustained **any** loss of support, loss of services, loss of nurture, guidance, care and instruction, or loss of inheritance, let alone what the value of any such damages would be. Therefore, G.E. cannot recover under DOHSA for this reason as well.

To summarize, Plaintiffs have failed to establish such financial dependency between Tatiana and G.E. and their sister (Briana), or between Mr. Costa and his step-daughter (Briana). Accordingly, RCCL is entitled to a summary judgment as to Counts I and II with respect to each of these three Plaintiffs. Marla, however, survives RCCL's summary judgment motion under the DOHSA argument in Counts I and II. Her claim (unusual as it may be) may not survive trial, of course, but that potential result will have to await further developments.

### Have Plaintiffs Met the Zone of Danger Test?

In Counts IV through VII, Plaintiffs assert claims for negligent infliction of emotional distress ("NIED"). There are four counts because the four Plaintiffs proceeded on a one-plaintiff-per-count basis.

Plaintiffs claim that they suffered an actual physical impact, which means they meet the first method of proving the zone of danger test (and do not need to meet the

requirements under the second method of passing the zone of danger test). But the Undersigned disagrees, as outlined below.

Although the Undersigned agrees that Plaintiffs have produced sufficient evidence to show that they were at risk for summary judgment purposes, they have not demonstrated the *other* requirement of the second option under the zone of danger test: an actual objective physical manifestation of the alleged emotional injury where there has been no physical contact. For that reason, summary judgment in RCCL's favor is warranted on Counts IV through VII.

General maritime law of the United States governs claims of negligent infliction of emotional distress brought under the federal courts' admiralty jurisdiction. *See Tassinari v. Key West Water Tours, L.C.*, 480 F. Supp. 2d 1318, 1320 (S.D. Fla. 2007). Claims of negligent infliction of emotional distress under maritime law must survive the "zone of danger" test. *See Chaparro v. Royal Caribbean Corp.*, 693 F.3d 1333, 1337-38 (11th Cir. 2012).

Pursuant to a zone of danger analysis, recovery for emotional injury is limited to those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct or who are placed in immediate risk of physical harm by that conduct. *See Consol. Rail Corp. v. Gottshall*, 114 S. Ct. 2396, 2406 (1994). That is, those within the zone of danger of physical impact can recover for fright, and those outside of it cannot. *See id.* at 2407. Consequently, plaintiffs must claim more than mere witness of a traumatic

44

event to sufficiently plead negligent infliction of emotional distress -- the plaintiff must be threatened with imminent physical impact if he or she has not actually sustained a physical impact. *See Chaparro*, 693 F. 3d at 1338.

As this Court recognized in its Order on RCCL's Motion to Dismiss, Plaintiffs cannot recover for merely emotional distress arising from the loss of Briana, but rather may recover for anguish experienced by them only as a result of incurring actual physical impact or meeting the other requirements of the zone of danger test when there is no physical impact. [ECF No. 30 at p. 12].

Specifically, a plaintiff seeking to recover for negligent infliction of emotional distress under the second method of meeting the zone of danger test (i.e., when there is no physical impact) is required to *also* demonstrate an objective physical manifestation of the alleged emotional injury where there has been no physical impact. *See Tassinari*, 480 F. Supp. 2d at 1325 (granting defendant's motion for judgment on the pleadings in an NIED case); *Williams v. Carnival Cruise Lines, Inc.*, 907 F. Supp. 403, 406 (S.D. Fla. 1995).

The Undersigned will first address Plaintiffs' argument that they did, in fact, have a physical impact. Plaintiffs contend that they suffered **two** impacts, which, they say, means "their physical manifestation of an emotional injury is unnecessary."

According to Plaintiffs, the first impact is that they consumed food similar to the food Briana consumed. And they say the second impact is because of the **"risk"** of

45

acquiring salmonellosis by person-to-person contact by providing care for Briana during her episodes of vomiting and excreting diarrhea. But the risk factor is discussed during the second zone of danger theory, when there is no physical impact; it is not a factor which **causes** or **establishes** the physical impact required to avoid the need to establish physical manifestation of emotional injury under the second prong of the zone of danger inquiry.

Plaintiffs are confusing the two alternate theories, and they are also misinterpreting the Undersigned's earlier analysis, in the motion to dismiss Order. The discussion in the earlier Order about Plaintiffs' possible contact with Briana herself and the fear of being exposed to Salmonellosis concerned the issue of whether Plaintiffs were at risk -- not whether they sustained a physical impact.  That discussion focused on the second way of meeting the zone of danger test, not the first method (of sustaining an actual physical impact).

The two "impacts" alleged by Plaintiffs are inadequate to establish the impact necessary to avoid the requirement of establishing an actual physical manifestation of emotional injury (which is a condition under the second method of meeting the zone of danger rule).

In *Metro-North Commuter Railroad Co. v. Buckley*, 117 S. Ct. 2113 (1997), where the plaintiff alleged a claim for negligent infliction of emotional distress after being exposed to insulation dust that contained asbestos, the United States Supreme Court addressed

whether a plaintiff's physical contact with the insulation dust amounted to a "physical impact" under *Gottshall*. *Id.* at 2116-17. In the Supreme Court's view, "the 'physical impact' to which *Gottshall* referred does not include a simple physical contact with a substance that might cause a disease at a substantially later time – where that substance, or related circumstance, threatens no harm other than that disease-related risk." *Id.* at 2117. The Court continued:

> Taken together, language and cited precedent indicate that the words "physical impact" do not encompass every form of "physical contact." And, in particular, they do not include a contact that amounts to no more than an exposure – an exposure, such as that before us, to a substance that poses some future risk of disease and which contact causes emotional distress only because the worker learns that he may become ill after a substantial period of time.

*Id.* at 2118.

In the instant case, there is no evidence that any of the Plaintiffs suffered physical injury or impact or harm as a result of RCCL's alleged negligence. As explained by the Supreme Court in *Buckley*, neither Plaintiffs' alleged consumption of food similar to that which Briana consumed, nor their alleged person-to-person contact with Briana, is a "physical impact" under *Gottshall* even if either exposed Plaintiffs to Salmonellosis -- a disease which none of Plaintiffs contracted.

Rather, the "physical impact" test is limited to circumstances where the emotional distress derives from an actual physical injury. *See Tassinari*, 480 F. Supp. 2d at 1323-24. Plaintiffs' alleged emotional distress did not derive from a physical injury. In

fact, Plaintiffs say, in their response, that their claims "are for having witnessed Briana die." [ECF No. 69 at p. 32]. Plaintiffs cite this Court's analysis, in my motion to dismiss Order, of *Smith v. Carnival Corp.*, 584 F. Supp. 2d 1343 (S.D. Fla. 2008), which involved a claim for emotional distress resulting from the plaintiffs having witnessed their mother's death. But this Court relied on *Smith* solely for the proposition that **DOHSA does not bar** claims for negligent infliction of emotional distress where the emotional distress is not the anguish of loss.

Although *Smith* determined that DOHSA did not preclude an emotional distress claim, the court **still** granted the defendant's motion to dismiss, ruling that, "[w]hile Plaintiffs' allegations may satisfy the relative bystander test, admiralty law allows recovery only for those passing the zone of danger test." *Id.* at 1354-54. Consistent with *Smith*, courts have routinely rejected claims for negligent infliction of emotional distress in the cruise line context where, as here, the alleged emotional distress resulted from **witnessing a death**. *See Gandhi v. Carnival Corp.*, 2014 U.S. Dist. LEXIS 33395 at *9 (S.D. Fla. 2014) (dismissing claim for negligent infliction of emotional distress where plaintiff alleged that he witnessed an incident on a cruise ship, tried to help his daughter and suffered emotional distress); *Nielson v. MSC Crociere, S.A.*, 2011 U.S. Dist. LEXIS 158852 at *27-28 (S.D. Fla. 2011) (dismissing NIED claim where complaint alleged that plaintiff suffered emotional distress as a result of witnessing his wife's death).

48

Because Plaintiffs have not established the first alternative way of meeting the "zone of danger" test (i.e., sustaining an actual physical impact from the defendant's negligence), their NIED claims can survive only if they submit sufficient evidence that they were at risk and have actual physical manifestations of emotional injury. Although they have established risk for summary judgment purpose, they have not produced evidence of a physical manifestation of an emotional injury. Therefore, summary judgment for RCCL is warranted on Counts IV through VII.

## IV.    CONCLUSION

For the reasons outlined above, the Undersigned **grants in large part and denies in small part** Defendant's summary judgment motion. Other than Marla's claims under Counts I and II, the Undersigned grants RCCL's summary judgment motion.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on November 3, 2016.


Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE


**Copies furnished to:**
All counsel of record