MARLA MARTINS, et al.,

      Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES, LTD.,

      Defendant.

_____/

## ORDER ON DEFENDANT'S MOTION TO ENFORCE SETTLEMENT AGREEMENT

"Be careful what you wish for" is a familiar proverb which warns of the possible unpleasant consequences of actually receiving what you desire. This well-used idiom may well apply to this maritime wrongful death lawsuit where the Plaintiffs want the Court to not enforce a purported settlement agreement which their former counsel entered into on their behalf with Defendant Royal Caribbean Cruises, Ltd. ("RCCL," "Royal Caribbean" or "Defendant").

Marla Martins, the most vocal of the Plaintiffs (and the one who filed *pro se* submissions opposing her former counsel's positions), contends that her former counsel pressured her into orally accepting a settlement offer presented to her on a Saturday morning telephone call. According to Ms. Martins, her attorney refused her request to

discuss the offer with the fellow Plaintiffs (who are her family members), directed her to make a decision then and there and advised her that she had no choice but to provide a response immediately. She contends that Plaintiffs' former counsel coerced her into accepting an oral settlement proposal for all the Plaintiffs while she was under duress and forced her to respond to the settlement proposal within a matter of minutes.

Her former counsel disputes this version of the events. Instead, her former attorneys say they acted professionally and appropriately. They describe her as a manipulative, opportunistic, money-driven, litigation-savvy client who cannot be believed. Her counsel previously sent her a text message saying that he "adored" her, so the relationship has, at a minimum, cooled.

Royal Caribbean assumed the case had settled. It never (until recently) had grounds to suspect conflict between Plaintiffs' former counsel and Ms. Martins and filed a motion to enforce the settlement agreement (and for sanctions against Ms. Martins). [ECF No. 96].

It is Royal Caribbean's motion which has generated the "be careful what you wish for" scenario, a phrase invoked by movie producers, musicians, singers and judges. *See e.g., Dreyer v. Sec'y, Dep't of Corr.*, No. 8:11-CV-62-T-30EAJ, 2011 WL 3516156, at *1 (M.D. Fla. Aug. 11, 2011) (invoking the proverb in connection with a criminal defendant who moved to set aside his original ten-year sentence and who then received

"exactly what he asked for – a new [15-year] sentence administered by a different judge").[1]

---

[1]     The original source for the old adage of "be careful what you wish for" may be untraceable, but it may well date back more than 200 years, to Goethe (1749-1832). James Joyce, *Episode 9 – Scylla and Charybdis,* Ulysses, http://www.online-literature.com/james_joyce/ulysses/9 (last visited Apr. 9, 2017) ("That may be too, Stephen said. There is a saying of Goethe's which Mr. Magee likes to quote. Beware of what you wish for in youth because you will get it in middle life.").

Nineteenth century writer Sarah Orne Jewett used a similar adage in *A Native of Winby*, a short story where she wrote: "Be careful what you wish for in this world, for if you wish hard enough you are sure to get it. I once heard a very wise man say this, and the longer I live the more firmly I believe it to be true." Sarah Orne Jewett, *A Native of Winby*,  https://americanliterature.com/author/sarah-orne-jewett/short-story/a-native-of-winby (last visited Apr. 10, 2017).

Even contemporary musicians and singers invoke this maxim.  For example, rap/hip-hop artist Eminem, on his "Relapse" album, released a bonus track song in 2009 entitled "Careful What You Wish For."  In that song, the Detroit-area native gave this musical advice: "So be careful what you wish for 'Cause you just might get it." Eminem, *Careful What You Wish For, on* Relapse (Interscope 2009).

Oscar Wilde (1854 – 1900), who often wrote of the human condition during the height of the Victorian Era in England in the late 1800s, used a similar phrase: "When the gods wish to punish us, they answer our prayers." Oscar Wilde, *An Ideal Husband,* http://www.quotationspage.com/quote/26900.html (last visited Apr. 9, 2017). Approximately a century later, actress Meryl Streep, playing the role of Karen Bixen, used a *slightly* modified version in the 1985 movie *Out of Africa*: "When the gods want to punish you, they answer your prayers." Out of Africa (Universal Pictures 1985).

Other judges invoking the "be-careful-what-you-wish-for" maxim refer to other potential sources of the phrase. For example, in *Dreyer*, the Court explained: "The exact origin of this phrase is unknown, but some attribute it to a short story by W.W. Jacobs that first appeared in *Harper's Monthly Magazine* in 1902. *See* W.W. Jacobs, *The Monkey's Paw*, HARPER'S MONTHLY MAGAZINE, Sept. 1902, at 634–39 (the original publication of the story that lacks the opening quotation but still vividly illustrates the lesson)." 2011 WL 3516156, at *1 n.1.

If Ms. Martins and the other Plaintiffs were to go forward with the settlement which Royal Caribbean believed had been accepted, then Defendant would pay $500,000. [ECF No. 128, p. 8]. But if there is no settlement, then the case will be subject to the Court's earlier-issued Order on Defendant's Summary Judgment Motion. That Order largely granted summary judgment for Royal Caribbean but permitted Ms. Martins to proceed (only) on Counts I (wrongful death under the Death on the High Seas Act, also known as DOHSA) and II (alternative wrongful death under DOHSA based upon apparent agency). But DOHSA limits recovery to the pecuniary loss sustained by the individuals for whose benefit the action is brought. Therefore, DOHSA bars recovery for non-pecuniary damages, such as pain and suffering, mental anguish and loss of society. The amount of permissible damages available to Ms. Martins under DOHSA is extremely limited and may well be significantly less than the $500,000 settlement which Royal Caribbean is seeking to enforce.

Maybe Ms. Martins will recover $500,000 or more at trial on the two DOHSA counts. Maybe she will prevail on an appeal (challenging the summary judgment order) taken after the case is over and the summary judgment order (which left some counts remaining) becomes final for appellate purposes. Maybe she will obtain a better result (at a subsequent trial or a later settlement) if she convinces the appellate court to reverse the summary judgment order. For now, though, her wish (and the wish of her fellow Plaintiffs) is to bypass the $500,000 settlement offer.

In this Order, the Undersigned is granting Plaintiffs' wish.[2] I will not enforce the settlement agreement because Royal Caribbean (the party seeking to enforce the agreement) has not met its burden of proving that (1) Ms. Martins had authority to settle on behalf of all the Plaintiffs (and the settlement offer was proposed on an all-Plaintiff basis) and (2) Ms. Martins was aware of all the significant terms of the settlement when the offer was communicated by counsel in a telephone call.

As noted by Royal Caribbean in a memorandum submitted after an evidentiary hearing [ECF No. 130, p. 4], "the settlement offer made by RCCL, and accepted by Plaintiffs' former counsel, was a global settlement offer to settle the *entire* case. Therefore, if the Court were to determine that the settlement is unenforceable as to *any* of the Plaintiffs, the <u>entire settlement must be set aside</u>." (bolded and italicized emphasis in original; underlined emphasis added).

Given this ruling, the Undersigned need not resolve the other factual disputes, such as whether Ms. Martins' former counsel unduly coerced her into accepting the settlement, whether former counsel should have advised Royal Caribbean and/or the Court that Ms. Martins no longer wanted to go forward with the settlement agreement

---

[2] By making reference to the proverb about the dangers of making wishes, I am in no way suggesting that the results of Ms. Martins' decision will in fact actually turn out to be more negative than a decision to accept the $500,000 offer which Royal Caribbean wants enforced. However, Plaintiffs' former counsel submitted a memorandum in which they estimated the trial recovery on the counts remaining for trial to be no more than $10,000. In addition, he sent a written message confirming the wisdom of the settlement offer after the Court ruled on the summary judgment motion.

at the time she initially advised of this position and whether Ms. Martins and/or her former counsel were intentionally delaying notice about the internal dispute to see how the Court ruled on the summary judgment motion.

Moreover, Plaintiffs' former counsel concedes that he did not mention a release or a confidentiality provision when he discussed the offer, so there are no credibility determinations which need to be made about that.

I will issue a new trial scheduling order separately (but only after I hold a status conference to discuss the pendency of other motions and when the parties anticipate being ready for a trial -- an issue which will invariably involve a discussion of who, if anyone, will be stepping in to represent the Plaintiffs).

**Factual Background**

Facts before the September 10, 2016 Telephone Call

This lawsuit concerns the death of Briana Martins ("Briana"), a seventeen-year old resident of New Jersey, aboard the vessel *Explorer of the Seas*, operated by Royal Caribbean in August of 2013. Plaintiffs allege that Briana's death was caused by the ingestion of bacteria-ridden food aboard the *Explorer of the Seas,* that the shipboard medical staff negligently treated Briana's illness, and that, individually, Marla, Marcelo, G.E. and Tatiana suffered extreme emotional distress because of RCCL's negligence.[3]

---

[3]     Marla Martins (Briana's mother), individually ("Marla" or "Ms. Martins") and as *administrator ad prosequendum* ("Administrator") for the Estate of Briana; decedent; Marcelo Costa ("Marcelo" or "Mr. Costa"); G.E., a minor, by and through her

Marla, Briana, Marcelo, G.E., and Tatiana boarded the *Explorer of the Seas* on August 22, 2013. Briana was taken to the infirmary on the *Explorer of the Seas* at 10:50 p.m. on August 27, 2013 and again at approximately 2:30 a.m. on August 28, 2013. Briana died on the ship on August 28, 2013.

On August 1, 2016, Royal Caribbean filed its summary judgment motion [ECF No. 53]. Plaintiffs filed an opposition response [ECF Nos. 68; 69] and Royal Caribbean filed its reply on August 18, 2016 [ECF No. 73]. With leave of Court, Plaintiffs filed a sur-reply [ECF No. 81].

From the time they boarded the *Explorer of the Seas* until Briana's death, Plaintiffs and Briana consumed only food prepared and provided by Defendant. Plaintiffs and Briana did not consume food at any of the ports of call preceding Decedent's death.

Plaintiffs filed a seven-count complaint alleging: wrongful death under DOHSA (Count I); alternative wrongful death under DOHSA based upon apparent agency (Count II); negligent hiring, retention and training (Count III); and negligent infliction of emotional distress ("NIED") for Marla, Marcelo, G.E. and Tatiana (Counts IV-VII). The Undersigned dismissed Count III, leaving six counts. [ECF No. 30].

---

grandmother, legal and natural guardian, and next friend, Ms. Martins; and Tatiana Martins ("Tatiana") are collectively, referred to as "Plaintiffs." Mr. Costa is Marla's current husband. Marla is also Tatiana's mother and G.E.'s grandmother.

## The September 10, 2016 Telephone Calls (and Events Leading up to It)

On September 2, 2016, the parties mediated the case but a settlement was not reached. For Plaintiffs, Ms. Martins, Mr. Costa and Tatiana attended, along with their counsel. Toward the end of the mediation, the mediator asked Plaintiffs if they would agree to a one-million-dollar settlement if he could persuade Royal Caribbean to make an offer.  [ECF No. 129, p.1]. Plaintiffs agreed to consider that offer if it were to be conveyed by September 6, 2016. No such offer was made.

On the morning of Saturday, September 10, 2016, Paul Hehir, Royal Caribbean's associate vice president of litigation, telephoned Plaintiffs' lead trial counsel, David Brill, to discuss a settlement proposal. Mr. Hehir has known Mr. Brill for approximately 15 years.  [ECF No. 122, pp. 7-8]. Mr. Hehir made an offer known among some litigators as a "high-low" proposal: if Royal Caribbean's summary judgment motion was granted on the NIED claims, then Plaintiffs would receive $500,000. But if the motion were denied on that claim, then the Plaintiffs would receive $1 million for a settlement. [ECF No. 122, p. 9].

Mr. Hehir's high-low proposal was an all-encompassing, global offer, covering all Plaintiffs. [ECF No. 122, pp. 9-10]. Mr. Brill advised that he would first need to speak to his "client" and then telephoned Mr. Hehir again approximately an hour to an hour and a half later. [ECF No. 122, pp. 9-10]. During this follow-up call, Mr. Brill advised

Mr. Hehir that he had spoken to "his client" and that "she" agreed to the terms after he told "her" about them. Mr. Brill then sent him a confirming email. [ECF No. 122, p. 10].

Before Mr. Brill made his follow-up telephone call to accept Defendant's high-low offer, he spoke on the telephone with Ms. Martins. That conversation lasted approximately 27 or 28 minutes. Mr. Brill and Ms. Martins have significantly different views of what was said and what happened during that Saturday morning telephone call. More on that later.

After Mr. Brill spoke to Ms. Martins on the telephone, he sent an email to Mr. Hehir, at 11:28 a.m. In that email, he confirmed the high-low settlement, including an explanation of the different financial results ($500,000, as opposed to $1 million), depending on how I ruled on the NIED claims. The email did not say anything about a release, nor did it say anything about confidentiality or when the payment would be made.

Post-Call Events

During a September 15, 2016 telephone hearing, counsel for both sides asked me to remove the case from the October 24, 2016 special set jury trial calendar, to stay a ruling on Plaintiffs' motion to amend the complaint, and to stay any pending *Daubert* motions, including motions to strike. The parties informally advised me that the case had, for all practical purposes, been resolved -- but that the settlement required me to rule on the pending summary judgment motion. Therefore, the parties asked me to rule

on Royal Caribbean's summary judgment motion. I entered a post-hearing Order consistent with the parties' requests. [ECF No. 87].

On November 3, 2016, I entered an Order [ECF No. 90] granting (in large part) Royal Caribbean's summary judgment motion. Significantly, I ruled in its favor on the NIED claims.

Almost a month later, on November 29, 2016, Mr. Brill filed a motion for "court guidance." In that motion [ECF No. 91], Mr. Brill advised that he and his partner, Joseph Rinaldi, spoke to Ms. Martins during a September 10, 2016 telephone call. They advised that "all issues were discussed and all questions were answered." The motion advised that Ms. Martins agreed to settle the case on behalf of herself and G.E. and with the consent of her husband (Mr. Costa) and her daughter (Tatiana).

The court guidance motion also noted that Mr. Brill sent a text message to Ms. Martins approximately 10 minutes later, advising that "[she] did [her]self, [her] family and Briana proud" and that the "high low on the summary judgment ruling is a no brainer victory for you." The motion also noted that Ms. Martins texted back the following response: "Thank you."

The motion then advised that Plaintiffs are entitled to the low amount of the high-low offer (based on the summary judgment ruling) -- but that Plaintiffs were refusing to sign both the Closing Statement and the Release. The motion asked for leave

to execute the Release on behalf of the Plaintiffs and to allocate the settlement funds as detailed in the Closing Statement.

Later the same day, the Undersigned issued an Order scheduling the motion for a telephone status conference on December 7, 2016 and directing Plaintiffs' counsel to forward the Order to his clients, who could participate in the telephone hearing.

On December 2, 2016, Ms. Martins, acting *pro se*, filed a notice of appeal [ECF No. 94] of the summary judgment Order (which left some of the counts intact).

On December 6, 2016, the day before the scheduled telephone hearing, Royal Caribbean filed its motion to enforce the settlement agreement and for sanctions against Ms. Martins. The motion explained that "[i]t was only after the Court's Order [granting, in large part, summary judgment] had been entered and the Release had been forwarded to Plaintiff's counsel that Defendant was informed that Ms. Martins' [sic] was apparently no longer willing to honor the settlement agreement." [ECF No. 96, p. 3]. The motion also explained that "there is no dispute between the attorneys in this case that a valid and enforceable settlement agreement has been, and continues to remain, in place." [ECF No. 96, p. 3].

Later the same day, Ms. Martins, again acting *pro se*, filed a "Declaration Statement of Plaintiff in Opposition to Motion for Guidance." [ECF No. 98]. It advised that the statements made in the motion for guidance "are not completely truthful to the court or accurate on all the facts." [ECF No. 98, p. 1]. Ms. Martins further advised that

her attorney told her that she had "no choice" but to accept the high-low settlement proposal. [ECF No. 98, p. 1]. She also represented that Mr. Brill rejected her request to discuss the proposal with her family, saying, "no, you have to make a decision now." [ECF No. 98, p. 1]. She said she was "barely able to speak for more than a minute or two" and was "not able to ask any real questions." [ECF No. 98, p. 2]. She described the telephone conversation as a "high pressure tactic" and claimed that she "did not understand why it was happening at that time." [ECF No. 98, p. 2].

Ms. Martins' declaration, which was signed under penalty of perjury, provided additional background. She said that she sent an email to Mr. Brill at 3:41 a.m. on Monday morning (less than two days after the Saturday morning telephone call) and told him "I am not comfortable[,]" "I do not agree[,]" and "do not want to accept these terms." [ECF No. 98, p. 2]. The email also said that "I really didn't like how I wasn't given some time to actually think about it, I don't like being pressured to make an instant decision." [ECF No. 98, p. 2]. The email also said, "So I am not agreeing to this." [ECF No. 98, p. 2].

According to Ms. Martins' declaration, Mr. Brill's response was, "we have a settlement and it can not be undone." [ECF No. 98, p. 2]. The declaration explains that she repeated her "I don't agree/I won't sign anything" position. [ECF No. 98, p. 2].

Ms. Martins' declaration also says that the details of the settlement agreement were never reduced to writing and never sent to her. [ECF No. 98, p. 3]. She said "there

was no clear agreement or meeting of the minds." [ECF No. 98, p. 3]. She likewise said that she never signed an agreement confirming the details of the settlement agreement

Ms. Martins also contends in her declaration that her "thank you" text from September 10, 2016 was taken out of context because it was actually "in response to a compliment that my attorney had made to me about the case." [ECF No. 98, p. 3].

Finally, her declaration advised that if the Court were to uphold the settlement agreement, then it should be for the high amount of $1 million because she was told "if the Summary Judgment allowed the case to go to Trial, **I** would receive the "High" on the Agreement." [ECF No. 98, p. 4 (emphasis added)].

The Court held a 45-minute telephone hearing on December 7, 2016. Ms. Martins participated, as did counsel for both sides. [ECF No. 97].

After the hearing, Plaintiffs' counsel filed a motion to withdraw [ECF No. 101]. In that motion, Mr. Brill advised that the Florida Bar ethics hotline advised him that withdrawal was "ethically necessary." The Undersigned granted the motion to withdraw. [ECF No. 102].

Approximately two weeks later, on December 20, 2016, Ms. Martins filed an opposition response [ECF No. 104] to Royal Caribbean's motion to enforce the settlement agreement. It was a *pro se* submission. It included a memorandum of law, citing both federal and Florida case law authority. Basically, the response repeated, albeit in greater detail, the points raised in the declaration. Boiled down to its basic

themes, the response argued: (1) the settlement agreement is not valid because the parties did not agree to all material terms; (2) Mr. Brill used deceptive practices and misrepresentations to force her, under duress, to quickly consent to the settlement agreement; (3) there is ambiguity surrounding the settlement agreement because Mr. Brill told her that the higher settlement amount would be paid if she was able to go to trial (as opposed to a higher offer if the NIED claims were permitted to proceed); (4) Mr. Brill acted improperly by not advising the Court and Royal Caribbean that she did not agree to the settlement; and (5) she had not seen the September 10, 2016 emails between Mr. Brill and Mr. Hehir until she asked the Court for a copy on December 6, 2016. Ms. Martins asked for oral argument on the motion to enforce the settlement agreement. She raised all of the same points (outlined above) in a separately filed response [ECF No. 105] in opposition to the motion for court guidance.

Counsel for Plaintiffs' former counsel filed a brief reply [ECF No. 110] to Ms. Martins' opposition to their motion for court guidance, advising that they disagreed with many of her contentions, which they describe as "probably false." They agreed that an evidentiary hearing (a procedure the Undersigned suggested at the telephone during) was required.

On January 10, 2017, the Eleventh Circuit Court of Appeals dismissed Ms. Martins' *pro se* appeal for lack of jurisdiction because the Order being challenged on

appeal "is not a final, appealable order because it did not end the litigation on the merits." [ECF No. 113].

The Court scheduled an evidentiary hearing for January 23, 2017 and reminded Ms. Martins of the wisdom of obtaining counsel for the hearing. Before the hearing began, an attorney filed a limited notice of appearance [ECF No. 118] for "plaintiff," advising that his involvement would be limited to "issues relating to whether there is a settlement agreement and/or its enforceability." The limited appearance notice further explained that "in the event that this Court allows the underlying case to proceed, undersigned counsel is not and will not be representing **plaintiff** in that action." (emphasis supplied).

Four witnesses testified at the evidentiary hearing: Mr. Hehir, Ms. Martins, Mr. Brill and Tatiana. [ECF No. 122].

Mr. Hehir's relevant testimony was outlined above.

In addition to the points described above in her declaration and other submissions, Ms. Martins provided the following relevant testimony:

During the September 10th, morning-telephone call, Mr. Brill told her that the offer was "if you -- if the judge rules on summary judgment that you can go to trial, Royal Caribbean will pay you one million.  If the judge rules that you can't go to trial, you, only you, meaning me, I took it to mean Marla Martins, if you cannot go to trial,

they rule you cannot go to trial, you will receive a payment of 500,000." [ECF No. 122, p. 23].

No one sent her a draft of the offer or what the agreement would look like before, during or shortly after the phone call.

Significantly, Ms. Martins said she did not believe that she had the authority to bind the other Plaintiffs to the agreement presented by Mr. Brill on the telephone. She asked Mr. Brill for the chance to speak with the other Plaintiffs and he said "absolutely not." [ECF No. 122, p. 25].

At the end of the telephone call, her exact words were: "I guess I have to agree. If you're telling me I have no choice, I guess I have to agree." [ECF No. 122, p. 25].

According to Ms. Martins, Mr. Brill never discussed a confidentiality provision when he explained the settlement offer to her on the telephone. [ECF No. 122, pp. 25-26].

As of the time she sent Mr. Brill her email early on Monday morning, September 12, she believed they would be going to trial. [ECF No. 122, p. 29].

On cross-examination, Ms. Martins acknowledged that the NIED claims were the primary possibility for recovering substantial damages against Royal Caribbean and that the financial recovery under DOHSA would probably be less than $20,000. [ECF No. 122, p. 31]. Based on that understanding, she agreed to a million dollar settlement at the end of the mediation but the offer was never provided. [ECF No. 122, p. 32].

After the mediation, Ms. Martins wrote an email to Mr. Brill. In that email, she wrote, "I have fought many things in my life and have found loopholes in every law I have fought[.]" [ECF No. 122, p. 36]. She later explained that "loophole" means "different ways to apply the law." [ECF No. 122, p. 41].

Ms. Martins said that her "thank you" communication to Mr. Brill on September 10, after the telephone call, was in response to a message from Mr. Brill saying "I adore you." [ECF No. 122, p. 37].

Ms. Martins conceded that her Monday morning email to Mr. Brill said, among other things, "Because I am not comfortable with this high-low offer and I have **changed my mind**. I do not agree and do not want to accept those terms." [ECF No. 122, p. 39 (emphasis supplied)]. The next time she communicated with Mr. Brill was many weeks later, after the Undersigned entered the Order on the summary judgment motion. [ECF No. 122, p. 43].

Ms. Martins has been involved as a plaintiff in "several" other personal injury lawsuits before the one here against Royal Caribbean. All of those lawsuits ended with a settlement. She has also been involved in "several" landlord-tenant disputes, "several" foreclosure actions, "several" loan defaults and "two or three" bankruptcies. [ECF No. 122, pp. 44-45].

Mr. Costa did not initially attend the mediation but Royal Caribbean insisted that he, a party, attend. Mr. Costa ultimately showed up to the mediation. He did not attend

the evidentiary hearing I held because he could not get off from work. [ECF No. 122, p. 45].

Tatiana, age 25, provided the following relevant testimony:

She never advised Mr. Brill that he had authority to settle the case. She never told Mr. Brill at any point in the case that he did not need to communicate with her about issues in the case. [ECF No. 122, p. 107]. Neither Mr. Brill nor anyone from his office ever communicated the terms of the settlement offer (or agreement) to her, either orally or in writing. [ECF No. 122, p. 116].

She was with her mother on September 10 when Mr. Brill telephoned. She was not involved in the call but she saw her mother after the call ended. She described her mother as "upset" and "uneasy" about the conversation. She said her mother told her then that "she felt like she was being forced to do something she did not want to do." [ECF No. 122, p. 108].

On cross-examination by Royal Caribbean's counsel, Tatiana conceded that she could have contacted Mr. Brill to advise him that she did not agree with the settlement and did not want to settle the case. [ECF No. 122, p. 109].

During cross-examination from Mr. Brill's counsel, Tatiana agreed that she and her stepfather, Mr. Costa, deferred to Marla at the mediation about whether the case could or should be settled. [ECF No. 122, p. 110].

She assumed that the offer communicated to her mother on September 10 was on behalf of all Plaintiffs. [ECF No. 122, p. 111]. Her stepfather never directly told her that he objected to the settlement but the family spoke together and she knew, based on his comments, that he was not happy with the settlement. [ECF No. 122, p. 113].

Tatiana denied that her mother had authority to act for her and her stepfather and she said that they did not agree with the settlement once they heard about it. [ECF No. 122, p. 115]. She was, however, satisfied that her mother sent Mr. Brill an email advising that she did not want to settle. [ECF No. 122, p. 117]. She did not think she needed to personally communicate with Mr. Brill. [ECF No. 122, pp. 117-18].

Mr. Brill's relevant testimony is summarized below:

He (and his firm) had authority from Mr. Costa and Tatiana to have Ms. Martins be their spokesperson and advocate -- but that authority was never reduced to writing. [ECF No. 122, p. 97].

When he had his Saturday morning telephone conversation with Mr. Hehir, Royal Caribbean did not impose a time deadline in which he had to respond. [ECF No. 122, p. 98]. However, if the summary judgment ruling came out before he responded, then it "would be a game changer." [ECF No. 122, p. 98].

Mr. Brill specifically and unequivocally denied that Ms. Martins told him that she wanted the opportunity to speak with her husband and daughter about the

settlement offer. He similarly denied that Ms. Martins asked for more time to consult before responding. [ECF No. 122, pp. 98-99].

In addition, Mr. Brill denied advising Ms. Martins that she had to decide the issue immediately. To the contrary, Mr. Brill said that he and his partner advised her to "take the time she needs" and that it was against their recommendation to delay past that day. He said they emphasized the risk of delay -- Royal Caribbean could change its mind or the Undersigned could issue a ruling on the summary judgment motion, or both. [ECF No. 122, p. 99].

Mr. Brill had not heard from Mr. Costa or Tatiana about not wanting to go forward with the settlement. [ECF No. 122, p. 101].

Mr. Brill estimates the amount of Ms. Martins' financial recovery under DOHSA to be less than $10,000. [ECF No. 122, p. 102]. After my summary judgment Order was entered and Ms. Martins refused to sign the settlement documents, he told her that she would receive far less than the $500,000 which would be received under the settlement agreement. According to Mr. Brill, Ms. Martins was not impressed with this explanation and said, "I think there's always a way." [ECF No. 122, p. 103].  He told her that he "would be shocked if we even had gotten an oral argument on an appeal, let alone been successful with the Eleventh Circuit." [ECF No. 122, p. 104]. Basically, he told Ms. Martins that he "did not think our chances of success on the appeal were good at all." [ECF No. 122, p. 104].

Mr. Brill's recollection of his September 10, 2016 telephone call with Mr. Hehir emphasized that the offer would be contingent on "the most important and discrete issue" of how the Undersigned would rule "on the negligent infliction of emotional distress claims." [ECF No. 122, p. 58]. He described that claim as the one which "loomed largest" because "we all knew that DOHSA was the tiny, little tail on a very large animal." [ECF No. 122, p. 51]. In fact, Mr. Brill explained that this was the reason why Ms. Martins and her family were turned down by several other lawyers – "because the DOHSA claim was a loser even if you won. You would spend more time prosecuting it then [sic] you would get from it." [ECF No. 122, p. 51].

Concerning his relationship with the three adult Plaintiffs, Mr. Brill explained that Ms. Martins had been "the leader, the quarterback, so to speak, of the team." [ECF No. 122, p. 53]. He further explained that he had "always [been] informed through all of them that that is with whom we should communicate and she spoke for all of them." [ECF No. 122, p. 53].

Mr. Brill construed Mr. Hehir's offer as being made to all of the plaintiffs. Mr. Brill advised Ms. Martins of the offer, and he believed that Ms. Martins had no confusion or uncertainty about the terms. [ECF No. 122, p. 53].

After the Court entered the summary judgment Order, Mr. Bill sent an email to Mr. Hehir, advising that Royal Caribbean should send a payment draft in the low amount of the high-low agreement, made payable to the law firm's trust account. [ECF

No. 122, p. 59]. The release which was to be signed in connection with the settlement contained a limited confidentiality provision. Confidentiality had been discussed consistently throughout the mediation. [ECF No. 122, p. 61].

Mr. Brill forwarded the summary judgment Order to Ms. Martins as an attachment to a November 3, 2016 email. In the email, he advised that "settling the case was obviously the right call" and noted that "without the settlement, the Order would have left you, Marcelo, Tatiana and [G.E.] with zero recovery." The email also directed Ms. Martins to "please share this Marcelo and Tatiana."

Mr. Brill first advised Royal Caribbean's counsel that Ms. Martins was not going forward with the settlement shortly after it delivered the release to him on November 3, 2016. [ECF No. 122, p. 63].

On cross-examination by Ms. Martins' new counsel, Mr. Brill conceded that he does not have anything in writing from Ms. Martins, authorizing him to settle for one million dollars. [ECF No. 122, p. 67].

Mr. Brill's office received signed retainer letters from Ms. Martins, Mr. Costa and Tatiana. [ECF No. 122, p. 69]. He did not communicate with Mr. Costa or Tatiana on September 10. [ECF No. 122, p. 69].

The email Mr. Brill sent to Royal Caribbean's counsel on September 10 does not mention confidentiality. [ECF No. 122, pp. 69-70]. In Mr. Brill's view, the settlement agreement was reached the moment he orally agreed with Mr. Hehir on the telephone,

before he sent the confirming email, which he said he did not even need to send. [ECF No. 122, p. 72].

Mr. Brill was not surprised that the settlement agreement and release sent by Royal Caribbean required all three Plaintiffs to sign. [ECF No. 122, p. 73]. He did not discuss the settlement at issue in the agreement and release with either Mr. Costa or Tatiana, however. [ECF No. 122, p. 73].

Although Mr. Brill said that the family gave Ms. Martins the authority to speak for them, he would communicate with Tatiana if, for example, interrogatories were directed toward her. [ECF No. 122, p. 74].

After Ms. Martins sent Mr. Brill the Monday morning email, which he described as one where she said she changed her mind, he did not advise Royal Caribbean or the Court that she did not agree to the settlement. [ECF No. 122, pp. 76-77]. When he received the Court's summary judgment Order, he forwarded it to Ms. Martins on November 3, 2016 and advised her that "we obviously were smart to make the settlement." [ECF No. 122, p. 79].

From September 12 through the rest of the month, Mr. Brill said, he repeatedly tried to communicate with Ms. Martins. He stopped those efforts in September, after his efforts failed. [ECF No. 122, p. 81]. From September 12 through November 3, Ms. Martins had not taken any action on the settlement, and she never once communicated with Mr. Brill or returned a call, a text or an email. [ECF No. 122, p. 81].

According to Mr. Brill, Ms. Martins never indicated that she would do anything other than wait to see how the judge would rule before she would take any action. [ECF No. 122, p. 82].

After Ms. Martins refused to sign the settlement documents, Mr. Bill said he tried to demonstrate to her that coercion would not be a legitimate theory to undo the settlement agreement because Royal Caribbean and its counsel were not the ones who supposedly intimidated or pressured Ms. Martins. [ECF No. 122, p. 89].

Mr. Brill's partner, Joseph Rinaldi, who participated in the September 10 telephone call with Ms. Martins did not testify at the hearing.

**The Parties' Positions**

After the evidentiary hearing, the Undersigned required the parties to mediate, but the mediation was not successful. [ECF No. 127].

Following the unsuccessful mediation, the parties (Plaintiffs, Royal Caribbean and the Brill and Rinaldi law firm) submitted memoranda. Their positions are summarized below:

*Plaintiffs*

Plaintiffs' memorandum [ECF No. 129] notes that no draft settlement agreements, no outline of bullet points, and no details of the proposed settlement were ever sent to any of the Plaintiffs. They also emphasize that Mr. Brill never advised Royal Caribbean or the Court that Ms. Martins had sent an email, advising that she did not

agree to the settlement mentioned to her during the September 10 telephone call. Moreover, they stress that Mr. Brill participated in a hearing with the Undersigned a few days after receiving Ms. Martin's email but never mentioned the email (and, in fact, represented that there was a settlement).

They also contend that Mr. Brill never had authority to settle the claims of Mr. Costa and Tatiana. They note that Mr. Brill never spoke with them and never obtained authority from them.

They contend that the so-called settlement agreement could not be a valid settlement agreement because Mr. Brill never communicated critical provisions, such as a release and a confidentiality provision. Moreover, they contend that Ms. Martins' assent was "more like surrender" and that misrepresentations had been made to her (because she did in fact have a choice and RCCL had not imposed a specific deadline, so she need not have provided an immediate response).

Plaintiffs juxtapose Mr. Brill's conduct vis-à-vis the other Plaintiffs at other points in the case with his conduct when trying to obtain consent for the settlement proposal. For example, Mr. Brill insured that all Plaintiffs executed their own retainer agreements and personally attended the mediation. The mere fact that Ms. Martins might be the more-vocal member of the group does not eliminate Mr. Costa's and Tatiana's right to decide whether to accept the offer.

They reject the notion that Ms. Martins was trying to have it both ways by waiting until the Court issued its summary judgment ruling before communicating again with Mr. Brill. According to Plaintiffs, her email was "so clear that it is hard to accept that she was trying to have it both ways."

Finally, they say that an attorney can enter a settlement only if the client's authority is clear and unequivocal -- a scenario they say does not exist here. Moreover, they say that even when an attorney has authority to settle, the agreement could be rescinded upon a unilateral mistake. They urge the Court to deny the motion to enforce the settlement agreement and they ask that the case proceed to trial.

### *Plaintiffs' Former Counsel*

The Brill and Rinaldi law firm and its attorneys, along with attorney Robert McKee, submitted a memorandum in support of RCCL's motion to enforce the settlement agreement.

From a factual perspective, they deny that they used coercion, duress, overreaching or similar misconduct. But from a legal perspective, they argue that the duress or coercion (or similar misconduct) necessary to invalidate a settlement agreement must come from the opposing side or a third party, not a party's *own* attorney.

Moreover, they argue that a refusal to give Ms. Martins additional time to provide an answer to the settlement proposal is insufficient to generate the grounds needed to sustain a finding of duress, coercion, overreaching or similar misconduct.

They portray Ms. Martins as intelligent and sophisticated, pointing to her independent research and analysis of DOHSA and her *pro se* filings. According to Plaintiffs' former counsel, "that stuff just does not jibe with Ms. Martins' 'David Brill made me settle' theme." [ECF No. 128, p. 6]. They also suggest that her credibility is lacking. For example, they say that an attorney like Mr. Brill would not send a client like Ms. Martins a text message saying "I adore you and am honored to be your lawyer and your friend" after supposedly spending 27 minutes on the phone coercing her to settle a lawsuit. And they say her explanation for her "thank you" text (i.e., that it was in response to the second text only, about adoring her) is implausible on its face.

They also focus on their view of Ms. Martins' motive -- wanting more money than the $500,000 mandated by the high-low settlement agreement. Pointing to her declaration, Plaintiffs' former counsel argue that "someone who was coerced into a high-low settlement does not ask for the "high" as a fallback to extricating herself from the settlement." [ECF No. 128, p. 8].

Their memorandum also argues that Ms. Martins will not "relent in her charade" and refuses to "recognize that settlement is in the Plaintiffs' best interests." They say she is "entrenched" and "know[s] full well that the net effect if she were to prevail here is

that she, her husband, her daughter and her granddaughter all get nothing as opposed to securing the net of a half a million dollar settlement[.]" [ECF No. 128, p. 8]. This attitude, they argue, "is the act of a person so irrational, so intransigent, that she cannot be coerced; she is utterly **immune from coercion**." [ECF No. 128, p. 8 (emphasis added)].

Plaintiffs' former counsel brand as "an utter fiction by Ms. Martins" the notion that Mr. Brill did not have authority to communicate acceptance on behalf of Mr. Costa and Tatiana. They classify it as an argument of "very recent vintage" and they argue that "[t]his new, fictional argument is apparently the latest of those 'loopholes' about which Ms. Martins bragged in one of her e-mails to Mr. Brill that she has found since she was 14 years old." [ECF No. 128, p. 10]. To bolster this argument, they emphasize that Ms. Martins' September 12 e-mail did not in any way raise the argument that Mr. Brill lacked authority to settle the case for the other Plaintiffs.

They also point to Ms. Martins' notice of appeal, which was filed *pro se* on behalf of all Plaintiffs. As argued by Plaintiffs' former counsel, "Ms. Martins would have this Court believe that she had authority from her plaintiff husband and her plaintiff daughter to do that, but not to authorize settlement." [ECF No. 128, p. 11].

Moreover, Plaintiffs' former counsel consider the language of Ms. Martins' declaration significant because it uses the term "I," not "we" or "Plaintiffs." Specifically, the declaration said, in pertinent part, "**I** was told if the Summary Judgment allowed

the case to go to trial, **I** would receive the 'High' on the Agreement." And then it said, "if this Agreement is upheld, **I** should receive the "High" and not the low and thus $1 Million US dollars." According to Plaintiffs' former counsel, "there is no 'we' anywhere in there. Writing in the first person is how someone who has grown accustomed to the grant of power to speak for and bind in settlement her family member Co-Plaintiffs writes." [sic]. [ECF No. 128, p. 13].

As stated above, Plaintiffs' former counsel paint a bleak picture of what would happen if Ms. Martins and her fellow Plaintiffs are successful in setting aside the settlement (i.e, if the Court were to deny RCCL's motion to enforce the settlement agreement). According to their prediction, "there would be no settlement for any of the Plaintiffs, including minor child G.E.; only Marla Martins would have any chance of recovery, and that chance would be for a nominal amount under the Death on the High Seas Act – an amount dwarfed by a factor of about 10 by just the costs expended to date; Ms. Martins' husband, daughter and minor grandchild, G.E., would all be denied any recovery. Ms. Martins' oral commitment to Mr. Brill that the case be settled for all three Plaintiffs is the only avenue for recovery for Marcelo [Costa], Tatiana Martins and G.E." [ECF No. 128, p. 17]. They also contend that the minor child, G.E., would receive nothing as a result of the summary judgment determination without the settlement being enforced, and thus "the settlement is a windfall for the minor child." [ECF No. 128, p. 30].

They also contend that the absence of terms (in Mr. Brill's confirming email to Mr. Hehir) concerning a release and confidentiality provision and when payment would be made is "of no legal consequence." Issues such as whether a release or confidentiality provision would be required are, according to Plaintiffs' former counsel, all "ancillary, nonessential terms."

As alleged in the memorandum submitted by Plaintiffs' former counsel, they believe that Ms. Martins "waited to see what the closing statement said she would net, decided that she was not netting enough, and that is when she took the position that she had changed her mind for good two-and-a-half months earlier." [ECF No. 128, p. 24]. They similarly argue that Ms. Martins' refusal to return Mr. Brill's telephone messages and emails indicates that she was being coy and waiting to evaluate her net recovery before deciding what position to take.

They also urge the Court to place considerable significance on the refusal of Mr. Costa and Tatiana to return Mr. Brill's voicemail messages. They say it demonstrates that Ms. Martins "was the proverbial boss of her co-plaintiff family members in this litigation from inception of this case to the present." [ECF No. 128, p. 26]. They also say it establishes that Mr. Costa and Tatiana "waived their rights to challenge the settlement" [ECF No. 128, p. 26].

Plaintiffs' former counsel also deem Ms. Martins' silence in the face of receiving the summary judgment Order to be additional evidence of her lack of credibility. Their argument is straightforward:

> If Marla Martins really and truly changed her mind for good in September about 39 hours after the settlement was reached, then she assuredly would have responded to Mr. Brill's November e-mail attaching the summary judgment order and announcing the obvious: That she made the right decision to accept the high-low offer. Ms. Martins instead waited to see what the closing statement said she would net, decided that she was not netting enough, and that is when she took the position that she had changed her mind for good two and a half months earlier.

[ECF No. 128, p. 29].

Plaintiffs' former counsel end their memorandum by noting that "Ms. Martins' efforts to undo this settlement is plainly in the worst interest of G.E." [ECF No. 128, p. 31]. They explain that "the only other way to any recovery for the minor child G.E. thereafter, would be that Ms. Martins successfully appeals the summary judgment in a way that allows the entire case, including negligent infliction of emotional distress counts, to proceed, an extremely unlikely proposition." [ECF No. 128, p. 31].

Moreover, they say:

> she would need to hire a lawyer to bring and win that appeal, then hire another lawyer to prosecute all of the Plaintiffs' cases to trial. That trial lawyer would have to present evidence sufficient to avoid directed verdict; then convince a jury of all of the factual issues in dispute; receive a substantial verdict from the jury which allocates damages to the minor child for emotional distress (when presently there is, the Court has found, insufficient evidence of that minor child's physical manifestations of emotional distress); and then withstand post-trial motions. The Martins would have to hire appellate counsel to prevail on a certain appeal of that

verdict. At bottom, receiving nothing cannot possibly be in the best interest of this minor child.

[ECF No. 128, p. 31].[4]

### *Royal Caribbean*

Royal Caribbean's memorandum addresses both legal and factual issues. But its factual presentation is, for all practical purposes, to simply note that it was not involved in the circumstances and to defer to former counsel's analysis and comments, which it adopted.

RCCL unequivocally explained that the settlement offer it made was a global one, designed to settle the **entire** case. Thus, it points out that "if the Court were to determine that the settlement is unenforceable as to **any** of the Plaintiffs, the entire settlement must be set aside." [ECF No. 130, p. 4 (emphasis in original)].

Royal Caribbean pointed out that, regardless of the Court's credibility determinations, it is undisputed that it and its attorneys had no knowledge of any purported dispute until after the summary judgment Order was entered. Therefore, it argues that any disruption of the settlement, whether due to Plaintiffs' actions or those of their former counsel, would unfairly prejudice RCCL.

---

[4] This list of challenges is, for all practical purposes, the types of consequences envisioned by the "be-careful-what-you-wish-for" proverb. Of course, this list of hurdles and problems for Ms. Martins and her fellow Plaintiffs does not include the possibility (or maybe even a probability) that her former attorneys have, or will, assert charging and/or retaining liens on the file and any recovery.

**Additional Observations**

Mr. Brill and Mr. Hehir did not discuss the release requirement or a confidentiality provision in their Saturday morning telephone call in which the settlement proposal was made.

Mr. Brill did not discuss either of these two topics with Ms. Martins during their Saturday morning telephone call.

Mr. Brill's September 10, 2016 confirming email to Mr. Hehir did not mention these two topics.

Mr. Brill did not have a reason which adequately explained why his firm had signed retainer agreements from all three named Plaintiffs but did not also have signed authorizations from Mr. Costa and Tatiana designating Ms. Martins as their agent who had authority to accept or reject settlement offers.

Although Mr. Brill sent Ms. Martins a text message shortly after he completed his September 10, 2016 telephone conversation with her, the text message said nothing about the **terms** of the settlement other than the two amounts of the high-low offer.

One of the major disputes concerning the September 10 telephone call between Mr. Brill and Ms. Martins is whether he explained that the high-low offer was contingent on the Court's ruling concerning the NIED claims. Ms. Martins says her understanding was that the settlement would be $1 million if any portion of the case went to trial, while Mr. Brill's version is that this higher settlement alternative would

apply only if the NIED claims went to trial. But there is nothing in the post-call texts or phone calls to shed light on this difference in perspectives. And there is no document after the call concerning this topic until Mr. Brill's November 3, 2016 email, forwarding a copy of the summary judgment Order.

Mr. Brill did not send Ms. Martins anything in writing to summarize, outline or explain the settlement offer before Ms. Martins wrote her September 12, 2016 email advising that she did not agree to it.

Mr. Brill never advised Ms. Martins of the settlement terms other than the amount until he forwarded the release/settlement documents and the closing statement.

Mr. Brill never directly advised Mr. Costa and Tatiana of the settlement terms and never communicated directly with them about the settlement offer or its terms.

Mr. Brill never confirmed in writing with Ms. Martins that her acceptance of the settlement offer during the September 10, 2016 telephone call was also on behalf of Tatiana and Mr. Costa.

Likewise, Mr. Brill never obtained written confirmation from Ms. Martins (or Mr. Costa and Tatiana) that Ms. Martins could act as the agent for her co-Plaintiffs and accept a settlement proposal on their behalf.

Mr. Brill instructed Ms. Martins to "share" the summary judgment Order with her husband and daughter but he did not give her a similar directive seven weeks earlier about the settlement offer itself.

The proposed release (part of a "Confidential Settlement Agreement and General Release of All Claims") which RCCL forwarded to Mr. Brill following the summary judgment Order is comprehensive. For example, the four pages of single-spaced text also includes an agreement to "indemnify and save harmless" RCCL and a confidentiality provision. It also includes a prevailing party attorney's fees provision.

Finally, it appears as though the parties conflated Ms. Martins' status as being the most outspoken of the three adult family Plaintiffs as a *de facto* indication that she had sufficient authority to settle for the other two. Moreover, it seems at times as though the parties simply *forgot* that there were actual Plaintiffs besides Ms. Martins herself. Mr. Brill mentioned a need to speak to his "client" and even Ms. Martins discussed the settlement proceeds as though they were hers, as opposed to a pool of funds to be allocated among all Plaintiffs. And her new counsel's notice of appearance mentioned only "plaintiff" (singular), rather than Plaintiff**s** (plural).

## Applicable Legal Principles and Analysis

Before discussing and analyzing the applicable legal principles, the Undersigned believes it is important to note that RCCL and its counsel did absolutely nothing wrong or unprofessional in connection with the settlement. To the contrary, its counsel came up with a creative solution to unblock the logjam experienced at the mediation a few days earlier. RCCL naturally assumed that Mr. Brill had obtained the necessary

authority from all of his clients to accept the settlement proposal and adequately explained the proposal to them.

In retrospect, it might have been more prudent for RCCL's counsel to have specifically mentioned the release and confidentiality and time of payment in his initial oral outline of the settlement proposal to Mr. Brill and to have at least briefly noted those topics in a responsive email to Mr. Brill's email confirming acceptance of the settlement proposal. But, as noted in the Barenaked Ladies song "Take it Back," this would be a review conducted with "the perfect 20/20 hindsight/ That our fate enjoys."[5]

One other introductory point about RCCL's position: RCCL contends that it would be unduly prejudiced if the settlement were not enforced. The Undersigned does not necessarily agree. If the settlement were to be enforced, then RCCL would need to pay $500,000. If the settlement were not enforced (for the reasons outlined below), then RCCL would not need to now pay $500,000. Instead, it would be required to defend a streamlined case containing only the DOHSA counts at trial.

The discovery in the case is over, so it would not cost RCCL much in fees and costs to try the lawsuit. Even if RCCL were to lose at trial, the damages, as estimated by Plaintiffs' former counsel, would be $10,000 or less. And if RCCL needed to defend the summary judgment Order on appeal, then its trial and appellate costs would still be **far** less than the $500,000 it would be required to pay under the settlement. So I'm not

---

[5]    BARENAKED LADIES, *Take it Back*, *on* BARENAKED LADIES ARE ME (Desperation 2006).

convinced that RCCL's purported prejudice would be *undue.* Any negative consequences to Royal Caribbean would reach the undue level only if the summary judgment Order were to be reversed on appeal (after the limited trial) and if Plaintiffs recovered more than $500,000 at a second trial. Given that Mr. Brill already explained that he viewed the appellate chances as small, there are surely several hurdles which would need to be cleared before an order denying the motion to enforce the settlement agreement would put RCCL in a worse situation.

In any event, the parties have spent considerable time debating the issues of coercion and duress (and whether the alleged coercion and duress necessary to invalidate a settlement agreement can come from a party's own counsel). But the Undersigned need not determine whether this type of conduct tainted Ms. Martin's acceptance of the settlement offer during the September 10, 2016 telephone call. There are *other* reasons to not grant RCCL's motion to enforce the settlement agreement.

Settlement agreements are governed by contract law and therefore, there must be a "meeting of the minds as to the essential settlement terms in order for settlement agreements to be enforceable." *Lunas v. Cooperative De Seguros Multiples De Puerto Rico,* 100 So. 3d 239, 241 (Fla. 2d DCA 2012) (internal citation omitted). As *Lunas* and many cases explain, a valid and enforceable agreement is not created merely when the parties *meant* the same thing; it is only when they *say* the same thing -- when they exchange sets of external signs. In *Lunas,* the court noted there was no agreement because the

agreement to pay "policy benefits" did not state an actual dollar amount, which is described as an "essential element." *Id.* at 242. Moreover, the terms of the agreement provided for the issuance of two checks. *Id.* When only one check was issued instead, that indicated that the parties did not say the same thing. *Id.*

As outlined above in the facts section, there was no discussion between the attorneys about a release and there was therefore no discussion between Mr. Brill and Ms. Martins about a release when the settlement proposal was discussed. Given this dynamic, the Court notes that several Florida cases held that settlement agreements not containing specific terms about releases and similar provisions (such as a hold harmless agreement or an indemnity agreement) are not sufficiently clear to constitute an enforceable agreement.

In *Thompson v. Estate of Maurice*, 150 So. 3d 1183, 1188 (Fla. 4th DCA 2014), the settlement offer did not include indemnification language. When the defendant conditioned its acceptance upon executing a release that introduced broad indemnification language, the court found that this injected an essential new element of the agreement whereby the parties had not actually agreed. *Id.* The court therefore reversed the summary judgment even though it acknowledged that "a release is implicit in an offer of settlement," but it noted that the plaintiff contends that there needs to be an agreement about the "character, nature or type of release to be used." *Id.* (internal citation omitted). The court noted that the defendant insurance carrier

conditioned its acceptance of a settlement offer upon the execution of a release that introduced broad indemnification language, thereby injecting a "new 'essential element of the agreement'" into the negotiations. *Id.*

Similarly, in *Gaines v. Nortrust Realty Management, Inc.*, 422 So. 2d 1037, 1038 (Fla. 3d DCA 1982), the parties "agreed" to exchange "releases" as part of a settlement. When the formal documents included **general** releases and one of the settling parties refused to sign because he was willing to sign only a *limited* release, the court found that this ambiguity alone was sufficient to find that there had been no agreement. *Id.* at 1040. Citing other cases, the *Gaines* court stated that the settlement had to be clear, full, complete, "cover all issues, and [be] understood by all litigants concerned." *Id.* (internal citations omitted). After noting that the type of release "to be exchanged was neither clearly expressed nor mutually understood during the discussions[,]" the Court reversed the summary judgment. *Id.*

*Pena v. Fox*, 198 So. 3d 61, 64 (Fla. 3d DCA 2015) involved an analogous scenario and the court there held that additional language in the release submitted by the insurance carrier was enough to find there was no agreement. In holding that no settlement had been reached, the appellate court explained that "while we share the circuit court's view that the inclusion of Mr. Fox's agents and employees within the release was not the product of nefarious motives, USAA's intention when it drafted this document, whatever it might have been, was irrelevant to the issue at hand." *Id.*

(internal citations omitted). And in another Florida appellate case, an insurer, who included a proposed hold-harmless agreement that was construed as a counter offer, had not proved a "mirror image" response to the proposed settlement agreement, which meant no settlement agreement had been created. *Peraza v. Robles*, 983 So. 2d 1189, 1192 (Fla. 3d DCA 2008).

A party seeking to compel enforcement of a settlement bears the burden of proving that the attorney has the clear and unequivocal authority to settle on the client's behalf. *See Cross-Aero Corp. v. Cross-Aero Serv. Corp.*, 326 So. 2d 249, 250 (Fla. 3d DCA 1976) (reversing order requiring plaintiff to carry out terms of settlement agreement because, among other reasons, the record did not establish that plaintiff's counsel had settlement authority); *see also Weitzman v. Bergman*, 555 So. 2d 448, 449-50 (Fla. 4th DCA 1990) (reversing order compelling settlement and noting that "it is the burden of the party seeking to compel the settlement . . . to show that the attorney had authority to settle the case"); *Jorgensen v. Grand Union Co.*, 490 So. 2d 214, 215 (Fla. 4th DCA 1986) (reversing order granting motion to enforce settlement agreement and highlighting that "[t]he law is clear that a client's express authority given to his attorney to settle his cause of action must be clear and unequivocal") (internal citation omitted).

Employment of an attorney to represent a client does not confer on the attorney implied or apparent authority to compromise or settle the client's claims. *See, e.g., Cross-Aero Corp.*, 326 So. 2d at 250.

Moreover, an attorney's belief that he or she has the authority to settle does not alone establish such authority. *See Weitzman*, 555 So. 2d at 449 ("[c]aselaw indicates that courts have been **very stringent** in what they find to be a 'clear and unequivocal' grant of authority") (emphasis supplied); *Dixie Operating Co. v. Exxon Co., U.S.A.*, 493 So. 2d 61, 63 (Fla. 1st DCA 1986) (declining "to place the determination of whether clear and unequivocal authority was given under the control of the attorney exercising the authority on the basis of good faith belief when a dispute over that authority arises between the attorney and client").

*Albert v. Hoffman Electric*, 438 So. 2d 1015, 1016-17 (Fla. 4th DCA 1983) outlines some of the issues relating to an attorney's authority to settle a case. For example, an attorney has no implied or apparent authority to settle a case for their client (other than in an emergency situation). *Id.* at 1017. A client's authority must be clear and unequivocal. *Id.* Finally, an unauthorized settlement, even if signed by the attorney, is of "no effect and may be repudiated or ignored and treated as a nullity by the client." *Id.* (internal citation omitted). In *Albert*, the appellate court reversed a judgment based on a purported settlement and remanded for an evidentiary hearing to determine whether counsel had the requisite authority to settle. In the instant case, of course, the Undersigned has already held the evidentiary hearing. *Id.*

Interestingly, the court in *Lechuga v. Flanigan's Enterprises, Inc.*, 533 So. 2d 856, 857 (Fla. 3d DCA 1988) held that even when the attorney has authority to settle, an

agreement could be rescinded based upon a unilateral mistake. Moreover, the Court explained that an attorney has no authority to settle other than on those terms "unequivocally approved by the client." *Id.* Similarly, *Palm Beach Royal Hotel, Inc. v. Breese*, 154 So. 2d 698 (Fla. 2d DCA 1963) involved an insurance carrier-provided attorney who handled settlement negotiations without participation by the named defendant. The court rejected the theory that the attorney accepted the offer as an agent for the actual defendant and invalidated the "agreement." *Id.* at 700.

Given that the settlement proposal submitted orally to Ms. Martins made no mention of a release and certainly made no mention of a hold harmless condition, it is appropriate to mention *Nichols v. Hartford Insurance Co. of the Midwest*, 834 So. 2d 217, 219-20 (Fla. 1st DCA 2002). The *Nichols* court held that the details of a release need not be absolutely decided "as long as the parties agree on the essential terms," and found that the "indemnification clause in this case was an essential term." *Id.*

Framed by these principles, the Undersigned's analysis turns to the actual facts.

First, although there is *some* evidentiary support to uphold the theory that Ms. Martins had sufficient authority from Mr. Costa and Tatiana to settle the case for them without speaking to them about the offer, it is insufficient to establish the clear and unequivocal authority needed to create a settlement agreement. There is surely no written authority. Given that Mr. Brill's office took steps to obtain signatures from all adult Plaintiffs for other issues, this absence is far from trivial. Moreover, Tatiana

unequivocally testified that she did not give her mother settlement authority and she told the Court she was not in favor of the settlement agreement.

Ms. Martins surely had authority to settle her *own* case. And if I were to assume that she knowingly settled her own case, then the entire settlement would **still** need to be treated as a nullity. It was a global offer, designed to bind all Plaintiffs. If some of the Plaintiffs are excluded from the settlement because they never gave Ms. Martins the necessary authority (or the record fails to adequately prove it), then the entire agreement falls apart. All involved in this dispute over the purported settlement agreement agree to that.

Second, Ms. Martins was not advised of all the relevant terms of RCCL's settlement position during the initial telephone call. This scenario remains true even if the Court were to assume that Ms. Martins agreed to the settlement proposal as phrased and further assumed that she made the decision voluntarily, without duress, coercion or other improper motivating factor.

Mr. Brill could not have advised Ms. Martins about RCCL's position that comprehensive releases would be required -- because he was never told that himself before September 10. Likewise, Ms. Martins could not have been told about when payment would be received during the call because Mr. Brill had not been provided with that information either. And Ms. Martins could not have been told about RCCL's

position that confidentiality would be required in a settlement because that provision was also never communicated to Mr. Brill before he spoke with Ms. Martins.

In addition, no one advised Ms. Martins that a hold harmless agreement would be demanded as part of the settlement. Although the general concept of a release *might* be implicit in a settlement, a hold harmless provision cannot similarly be deemed to be somehow incorporated into a settlement without the parties' agreement to include one. *Nichols*, 834 So. 2d at 219-20. *Cf. Cheverie v. Geisser*, 783 So. 2d 1115, 1119 (Fla. 4th DCA 2001) ("Where the language of a release is disputed and the parties fail to reach an agreement as to the character, nature, or type of release to be used, an essential element of the agreement is not established.") (internal citations omitted); *Grimsley v. Inverrary Resort Hotel, Ltd.*, 748 So. 2d 299, 301 (Fla. 4th DCA 1999) (finding that notice of acceptance of settlement offer without agreement as to the releases did not establish an agreement).

Further, Mr. Costa and Tatiana surely were not aware of these terms because Mr. Brill never spoke with them about the settlement agreement.

## Conclusion

Plaintiffs are receiving what they told the Court they wished for -- an opportunity to go to trial and avoid the settlement agreement they say they never authorized. Whether they will experience the other half of the proverb -- i.e., being sorry -- is a question which likely will not be answered for some time.

The Undersigned *denies* RCCL's motion to enforce the settlement agreement and will soon schedule a telephone status conference. **Defense counsel is directed to immediately <u>serve</u> a copy of this Order on Mr. Brill, who, in turn, is directed to immediately and separately <u>serve</u> copies on Ms. Martins, Mr. Costa and Tatiana.**

In the meantime, all three adult Plaintiffs shall by May 1, 2017 advise the Court whether they are proceeding on a *pro se* basis or whether they have retained counsel. If they have retained counsel, then new counsel shall file a notice of appearance by this same May 1, 2017 deadline.

The Court will hold a telephone status hearing on Tuesday, May 9, 2017, at 10:00 a.m. If Plaintiffs are proceeding on their own, without counsel, then they all shall participate in the telephone hearing. If they are represented by counsel, then counsel is required to participate (although any party may phone in, given that hearings are open to the public).

**DONE AND ORDERED**, in Chambers, in Miami, Florida, on April 12, 2017.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>Copies furnished to:</u>
All counsel of record
Thomas E. Scott, Esq.